These consolidated appeals arose out of personal injuries sustained in 1974 by Joe Ree Espey and Jerry D. Lee, Plaintiffs/Appellees, when they fell from a scaffold while working for their employer, Mitchell Engineering Company (Mitchell), on the construction site of the MacMillan Bloedel particle board plant in Pine Hill, Alabama.
Plaintiffs originally sued MacMillan-Bloedel, Inc. (MacMillan), Louisville Ladder Company (manufacturer of the scaffold), six individual fellow employees, and twenty-three fictitious parties. In response to MacMillan's motion to dismiss, grounded on the assertion that it was not the premises owner, MacMillan-Bloedel Particle Board, Inc. (Particle Board), was substituted for MacMillan by amendment. Thereafter, Plaintiffs added several corporate defendants by substituting them for fictitious parties. Plaintiffs added Columbia-Eastern, Inc. (Eastern), in 1977; Columbia Engineering International, Ltd. (Columbia), in 1980; and brought back in MacMillan shortly before the beginning of trial in October, 1981.
During the trial, Defendants Louisville Ladder and the co-employees entered into a pro-tanto settlement for $300,000 in each case. The jury returned a $2,000,000 verdict against all remaining Defendants for each Plaintiff, which was subsequently reduced by the settlement. The court later held that the verdicts in each case were excessive, and Defendants' J.N.O.V./new trial motions were overruled contingent upon the filing of remittiturs. Plaintiffs filed remittiturs, reducing the unsatisfied judgments to $850,000 in each Plaintiff's case.
The dispositive issues can be grouped into two broad categories: 1) whether each respective Defendant was brought in improperly under Alabama's fictitious party practice, thereby causing the statute of limitations to run prior to their addition; and 2) the sufficiency, vel non, of the evidence to impose a legal duty upon each respective defendant, either by contractual obligations or voluntary undertakings, to make safety inspections, enforce safety regulations, or provide safe equipment for the benefit of the Plaintiffs. Because we hold that the trial court erred in denying each Defendants' motion for a directed verdict, we are compelled to reverse, and to render judgments for each Defendant. *Page 958 
 I. THE FACTS
When MacMillan decided to add a particle board plant to an existing pulp and paper facility, Particle Board was formed to operate the new plant. Various employees of MacMillan were in charge of letting contracts for Particle Board. A proposal was given to Columbia for engineering and construction services. Subsequent to the proposal, but prior to acceptance, Columbia and Simons-Eastern Corporation formed Eastern to carry out the subsequently accepted proposal. A contract was drafted between Particle Board, as purchaser, and Mitchell, as contractor, for the construction of certain metal buildings on the Particle Board project.
Under this contract, Mitchell was to attach metal siding to the buildings its employees erected. Mitchell obtained a swinging scaffold from Louisville Ladder to complete its contractual duty. The scaffold was secured to the side of the building by screws installed by the scaffold workers. The Plaintiffs were severely and permanently injured when one of these screws broke loose, allowing the scaffold to swing away from the building, thereby causing them to fall.
The captions of the summonses (there were no captions to the complaints) contained eight named defendants and twenty-three fictitious parties, followed by this language: "Plaintiff avers that the identity of the fictitious party defendants is otherwise unknown to the plaintiff at this time or, if their names are known to the plaintiff at this time, their identity as proper party defendants is not known to the plaintiff at this time, but their true names will be substituted by amendment when the aforesaid lacking knowledge is ascertained."
Fictitious party No. 1 was described as follows:
 "that entity or those entities who or which were responsible for the engineering work on the job on which plaintiff was working on the occasion made the basis of this suit;"
Fictitious party No. 3 was described as follows:
 "that entity or those entities who or which had any possession or right of control with regard to the premises upon which plaintiff was working on the occasion made the basis of this suit;"
Eastern and Columbia were substituted for fictitious entity No. 1, while MacMillan was substituted for No. 3.
The last numbered paragraph of Plaintiffs' original complaint states:
 "Plaintiff avers that the aforesaid wrongful conduct of each of the defendants combined and concurred, and plaintiff avers that as a direct result of this combined and concurring wrongful conduct of said defendants, plaintiff was injured and damaged as follows:. . . ."
 II. THE ISSUES
A. Whether the claims against Columbia, Eastern, andMacMillan are barred by the statute of limitations.
1. Columbia.
Plaintiffs commenced the original suit against Columbia after the one-year statute of limitations for negligence actions had expired. Therefore, in order for Plaintiffs' claims against this defendant not to be time barred, the substitution of Columbia for fictitious party No. 1 must relate back under ARCP 9 (h), pursuant to ARCP 15 (c).
Several recent cases of the Court control the disposition of this issue: Threadgill v. Birmingham Board of Education,407 So.2d 129 (Ala. 1981); Walden v. Mineral Equipment Company,406 So.2d 385 (Ala. 1981); Minton v. Whisenant, 402 So.2d 971 (Ala. 1981); and Fowlkes v. Liberty Mutual Insurance Company,392 So.2d 803 (Ala. 1980). These cases collectively stand for the proposition that a plaintiff, in order to invoke the relation back principles of Rules 9 (h) and 15 (c), must meet the following criteria: 1) Plaintiff must state a cause of action against the fictitious party in the body of the original complaint; and 2) plaintiff must be ignorant of the identity of the fictitious party, in the sense of having no knowledge at the time of the filing that *Page 959 
the later named party was in fact the party intended to be sued.
Study of these cases shows that Rule 9 (h) is not intended to give plaintiffs additional time beyond the statutorily prescribed period within which to formulate causes of action. Instead, the principal reason for the rule is to toll the statute of limitations in emergency cases where plaintiff knows he has been injured and has a cause of action against some person or entity, but has been unable to ascertain through due diligence the name of that responsible person or entity.Browning v. City of Gadsden, 359 So.2d 361 (Ala. 1978).
A contrary rule would emasculate the statute of limitations, which sets the time period a plaintiff has in which to determine who has hurt him and how. Indeed, such an interpretation would amount to nothing less than the creation of a "discovery" exception to the statute of limitations. Additionally, the argument in favor of such an interpretation would support a tolling of the statute until discovery of thecause of action, rather than the classical tolling untildiscovery of injury which is generally contemplated by our discovery statutes.
Plaintiffs attempt to distinguish factually the Fowlkes line of cases, and contend that the requirements of those cases are met. In support of this distinction, Plaintiffs point out that in Fowlkes, the fictitious parties were described as "persons, partnerships or corporations, whose names, identities, and places of business are unknown to the plaintiff," whereas in the instant case, fictitious party No. 1 was described with more particularity, and the activity material to the Defendant's liability — the engineering work — was stated.
We find no merit in this distinction. The proper scope of comparison is whether there was a cause of action stated in the body of the complaint, not on the degree of particularity with which the fictitious defendant is described. Nowhere in the complaint is there a description of any wrongdoing on the part of Columbia or fictitious defendant No. 1.
Plaintiffs argue further that a cause of action has been stated against the fictitious parties because, unlike inFowlkes, they specifically stated in the body of their original complaints that "the aforesaid wrongful conduct of each of the defendants combined and concurred, and plaintiff avers that as a direct result of this combined and concurring wrongful conduct of said defendants, plaintiffs were injured and damaged as follows." Plaintiffs incorrectly conclude that this language refers to all defendants, and thereby draws the description of fictitious party No. 1, which appeared in the summonses, into the complaints. Here, again, Plaintiffs fail to address the real question — whether there was any allegation of wrongful conduct by the fictitious party sufficient to constitute a cause of action. Even if the description of fictitious party No. 1 had appeared in the complaints, it would still be insufficient to state a cause of action, because there was no allegation of what the engineering company did wrong.
Plaintiffs inconsistently argue later in their brief, in response to Columbia's argument that Columbia was not timely substituted after its identity became known, that Plaintiffs "had no facts which would have indicated a probable cause of action against Columbia" until about a month prior to the amendment substituting Columbia in September, 1980. This concession reinforces our holding that no cause of action was stated against Columbia sufficient to invoke the relation back principles of Alabama's fictitious party practice.
It is evident from the briefs in this case that there is still confusion about the current status of our fictitious party practice. Indeed, many of the arguments made as to the proper interpretation of our fictitious party practice are addressed to the "unreasonableness" of the one-year statute of limitations for personal injury negligence actions. The problem, however, cannot be judicially remedied by giving Rule 9 (h) an unintended meaning. The remedy, if any, is one of policy that can only be addressed by a legislative extension of the statute of limitations. *Page 960 
To be sure, while one year is a relatively short period of limitations, our fictitious party rule is a liberal one. Any count in a complaint which would state a cause of action under our liberal notice pleading rules would also state a cause of action against a fictitious party. One need not state with more particularity a cause of action against an unknown party as compared to a named party — the test is the same. We should re-emphasize, however, that Rule 9 (h) was not meant to excuse ignorance of the identity of a cause of action, but only ignorance of the name of the party against whom a cause of action is stated.
Resolution of the previous issue would foreclose further discussion concerning Columbia were it not for this additional argument: Even if the amendment did not relate back, Columbia is nevertheless precluded from asserting the statute of limitations as a defense because it failed to plead this defense in its answer to Plaintiffs' complaints, thereby violating ARCP 8 (c). Plaintiffs base their waiver argument upon two Alabama cases — Robinson v. Morse, 352 So.2d 1355
(Ala. 1977), and Magic Tunnel Car Wash Equipment Co., Inc. v.Brush King Franchises, Inc., 53 Ala. App. 345, 300 So.2d 116
(Ala.Civ.App. 1974). In addition, it is argued that because Columbia waited almost a year before raising this issue, Plaintiffs were unduly prejudiced by engaging in extensive discovery. Therefore, Plaintiffs say, this delay should also constitute waiver.
In Robinson, the Court was confronted with a situation where the statute of limitations defense was raised after the appellant's motion for a new trial was denied. The Court addressed the issue thusly:
 "Rule 8 (c), A.R.C.P. requires that the affirmative defense of the statute of limitations be affirmatively set forth. See Blackmon v. Chrysler Motors Corp., 294 Ala. 426, 318 So.2d 286 (1975). Where, however, a party fails to plead an affirmative defense, it is generally deemed to have been waived. 5 Wright Miller, Federal Practice Procedure
§ 1278, pp. 339-52. Thus, it has been held in a number of cases that parties have waived their defense of the statute of limitations by failing to plead it. E.g., Senter v. General Motors Corp., 532 F.2d 511 (6th Cir. 1976); Jakobsen v. Massachusetts Port Authority, 520 F.2d 810 (1st Cir. 1975).
"Of course, there are exceptions to this rule.
 "`Of course, the waiver rule is not automatically applied and as a practical matter there are numerous exceptions to it. Thus, as discussed in the preceding section, the substance of many unpleaded affirmative defenses may be asserted by pretrial motions. Moreover, even if defendant does not assert an affirmative defense in his answer, he may amend his pleading under Rule 15 (a) without leave of the court within 20 days after it has been served if plaintiff is not permitted to interpose a responsive pleading. When this provision is unavailing, he may amend his pleading to assert an omitted affirmative defense on the written consent of the adverse party or by leave of the court, which "shall be freely given when justice so requires." Even as late as trial, if evidence relating to an unpleaded defense is introduced without objection, Rule 15 (b) requires the pleadings to be treated as if they actually had raised the issue. However, if the record indicates that the unpleaded affirmative defense has not been tried by the "express or implied consent" of the parties, the pleadings will not be treated as if they actually had raised the defense, and the court may decide not to permit the issue to be litigated.'
(Footnotes omitted.)
"5 Wright Miller, Federal Practice Procedure, § 1278 (citations omitted.)
"In this case, however, none of the exceptions apply. Not only was the statute of limitations issue raised for the first times six days after trial, but it was also not tried with the `implied or express consent of the parties.'" 352 So.2d at 1356-57. *Page 961 
In Magic Tunnel, a buyer brought an action against the seller of certain equipment to recover the down payment allegedly procured by fraud. The Court of Civil Appeals held that waiver results when the party raising the statute of limitations defense waits until oral argument on a motion for new trial before apprising the trial court of its reliance on such defense. The Court stated:
 "In the instant case we believe that defendant should have informed the trial court prior to or at the time of the request for the affirmative charge that it considered the complaint barred by the appropriate statute of limitations.
 "It is obvious from reading the record in this case that the trial was not conducted on the theory that the statute of limitations was a defense. The trial court instructed the jury on the law of fraud and, after concluding its charge on the law of the case, asked counsel if they were satisfied with the charge, and defendant's counsel answered that it was so satisfied. Furthermore, the written charges requested by defendant were directed to a finding for defendant on the failure of the evidence to prove that at the time the promises were made there was an intent not to comply with them. Such requests could have caused the trial judge to assume that the sole defense being relied on by defendant was the general issue, thereby obscuring the possible defense of the statute of limitations." Magic Tunnel Car Wash Equipment Co., Inc. v. Brush King Franchises, Inc., 300 So.2d at 119.
Columbia, in opposition to Plaintiffs' waiver contention, argues that its amended answer under ARCP 15 (c) related back to the time of the original answer. Columbia, in addition to distinguishing the cases relied on by Plaintiffs, cites Piercev. Webb, 398 So.2d 271 (Ala. 1981). In Pierce, the sole issue was "whether the amended answer pleading the defense of statute of limitations at the close of the case should have been permitted by the trial court." 398 So.2d at 271. This Court, affirming the trial court, held that ARCP 15 (b) permits a trial judge within his discretion to allow amended pleadings, and that the amendment fell within the exception to the general rule enumerated in Robinson that failure to plead such defense constitutes waiver.
Turning to the case at bar, we find the trial court allowed Columbia's amendment to its original answer, as in Pierce, and Plaintiffs made no motion to strike the amendment. Thus, the case having been tried upon the amended answer, the stated reasons for waiver in Robinson and Magic Tunnel are not controlling here. See Zeigler v. Baker, 344 So.2d 761 (Ala. 1977).
We hold, therefore, that because Plaintiffs' amendment adding Columbia did not relate back prior to the expiration of the one-year statute of limitations, and because Columbia did not waive this defense, the judgment against Columbia is due to be reversed, and judgment rendered in favor of Columbia.
2. Eastern.
Eastern was not brought into the lawsuit until August, 1977, over two years after the one-year statute of limitations for personal injuries had expired. It was also substituted for fictitious party No. 1. For the same reasons discussed under the previous subsection, we find that no cause of action was stated in the body of the original complaint, and consequently the amendment substituting Eastern did not relate back. Therefore, the statute of limitations is a valid defense.
Because this defense was raised in Eastern's original answer, no waiver question is presented. It follows that the judgment against Eastern likewise is due to be reversed, and judgment rendered in its favor.
3. MacMillan.
MacMillan was brought back into the lawsuit shortly before trial by substitution for fictitious defendant No. 3. Under the above-stated principles, it seems on first blush that MacMillan should also prevail on its statute of limitations defense, because no cause of action was stated against fictitious party No. 3. Here, however, because *Page 962 
MacMillan was named as an original defendant before the substitution of Particle Board, a different analysis is warranted. We must ascertain, therefore, whether MacMillan was validly in the lawsuit on some basis other than through substitution as a fictitious party.
MacMillan cites Eason v. Middleton, 398 So.2d 245 (Ala. 1981), for this proposition: Once a defendant is identified, properly before the court, and thereafter dismissed, the plaintiff cannot take advantage of the fictitious party rule to bring the dismissed party back in after the statute of limitations has run, because the identity of the party is known at the inception of the suit. We agree; but, as the Eason court pointed out, its holding is premised upon the utilization of the fictitious party rule:
 "Although it is not clear under which theory the plaintiff sought to add Wanda Middleton as a defendant, we assume that she was being added by the fictitious party provision of Rule 9 (h), ARCP. . . ." 398 So.2d at 247.
Plaintiffs contend, however, that they are not relying on the fictitious party provision as regards MacMillan. Their argument is this:
1) MacMillan was properly and timely served originally;
2) the order of dismissal was not made final pursuant to ARCP 54 (b); and, therefore, the action was not terminated as to MacMillan; and
3) the amended complaint, filed when MacMillan was added, related back to the time of the filing of the original complaints pursuant to ARCP 15 (c), because the claim arose out of the conduct set forth in the original pleading.
This Court in Eason did not address the situation where a nonfinal judgment was involved; nor did the Court address the effect of the first sentence of ARCP 15 (c) on facts as here presented. Had the final judgment been entered and the lawsuit terminated as to MacMillan, then its argument would not concern the statute of limitations. Rather, its argument would be that it had a final judgment, the time for appeal had run, and the subsequent amendment was barred under the doctrine of resjudicata. We find Plaintiffs' argument convincing, and hold the statute of limitations did not bar an action against MacMillan.
B. Whether MacMillan or Particle Board owed a duty toPlaintiffs to provide for their safety.
For affirmance of the judgment against MacMillan and Particle Board, we must find some evidence in the record upon which a reasonable jury could permissibly infer that these defendants owed a legal duty to provide for the safety of Plaintiffs. In examining this issue, we must consider two recent cases: Patev. United States Steel Corp., 393 So.2d 992 (Ala. 1981), andWeeks v. Alabama Electric Cooperative, Inc., 419 So.2d 1381
(Ala. 1982).
In Pate, plaintiffs sued United States Steel Corporation (USS) for personal injuries sustained in a fall from an unsafe construction scaffold while working for Foster, a builder, on a construction project at the plant of USS. Plaintiffs' principal theory of recovery was based upon a duty of care owed by USS arising out of an alleged prime contractor/subcontractor relationship with Foster. A second theory — voluntary undertaking to inspect the premises and negligent inspection — was also alleged. The trial court granted defendant's directed verdict motion. This Court affirmed.
Weeks, also, was a scaffold-injury case. In Weeks, the injured plaintiff was employed by a company involved in the construction of a power plant owned by Alabama Electric Cooperative (AEC). The issue was whether, under the evidence, AEC owed a duty to provide Weeks with a safe place to work. Affirming the granting of summary judgment in favor of AEC, theWeeks Court addressed the legal duty issue:
 "Appellant contends that there are sufficient facts to find that an employer-employee relationship existed between AEC and Weeks, thereby creating a duty to Weeks by AEC to provide him with a safe place to work. *Page 963 
 "The principles regarding the legal duty of a premises owner to provide a safe place to work for employees of an independent contractor are well settled. See, e.g., Alabama Power Co. v. Smith, 409 So.2d 760 (Ala. 1981); Thompson v. City of Bayou La Batre, 399 So.2d 292 (Ala. 1981); Pate v. United States Steel Corp., 393 So.2d 992 (Ala. 1981); Hughes v. Hughes, 367 So.2d 1384 (Ala. 1979); Evans v. Kendred, 362 So.2d 206 (Ala. 1978); Chrysler Corp. v. Wells, 358 So.2d 426 (Ala. 1978).
 "These cases firmly establish the general rule that a premises owner owes no duty of care to employees of an independent contractor with respect to working conditions arising during the progress of the work on the contract. `The general rule does not apply, however, if the premises owner retains or reserves the right to control the manner in which the independent contractor performs its work.' Thompson v. City of Bayou La Batre, 399 So.2d at 294; Hughes v. Hughes, 367 So.2d at 1386. `When the right of control is reserved, the relationship changes from one of premises owner and independent contractor to that of master and servant.' 399 So.2d at 294.
 "A master-servant relationship is not created, however, when the owner merely retains the right to supervise or inspect work of an independent contractor as it progresses for the purpose of determining whether it is completed according to plans and specifications, and retains the right to stop work that is not properly done. Pate v. United States Steel Corp., 393 So.2d at 995.
 "In face of AEC's proof denying any retained right of control, Weeks, as the non-moving party, must proffer some proof which creates a genuine issue of material fact; that is, he must offer some evidence on the factual issue as to whether AEC retained the right to direct the manner in which Weeks's employer, Howard P. Foley Company, or Specialty Contractors, the owner of the scaffold, performed its work. Any evidence tending to establish that AEC retained this control, either by contract or by its actions, will meet this burden of proof." 419 So.2d at 1383.
In the present case, Plaintiffs seek recovery on two theories:
1. Particle Board is liable to plaintiffs because it breached specific contractual obligations to supervise and insure safety on the Particle Board plant construction project. (This contractual liability is sought to be imposed only upon Particle Board, because MacMillan was not a party to the contract.)
2. Furthermore, both MacMillan and Particle Board are liable because the actions of each constituted a voluntary undertaking to provide for safety on the project, followed by a negligent breach of that voluntarily assumed duty, with resultant injuries to each of the Plaintiffs.
 1. Did Particle Board breach contractual obligations to enforce safety?
Plaintiffs candidly admit that there is insufficient evidence of retention of the right to control work to hold MacMillan or Particle Board vicariously liable for the negligent acts of the subcontractors or their employees. Plaintiffs state in their brief:
 "The significance of plaintiffs' waiver of any liability predicated on a master-servant relationship is that this appeal is not concerned with the focal issue treated in Pate v. U.S. Steel Corp., 393 So.2d 992 (Ala. 1981), and Weeks v. Alabama Electric Cooperative Inc., [419] So.2d [1381] (Ala. 1982). . . . More specifically, plaintiffs do not assert that Particle Board reserved the right to control the manner in which work was to be performed. Accordingly, plaintiffs do not contend the owner-independent contractor relationship was converted into a master-servant relationship, thereby imposing on Particle Board vicarious liability for the acts of the subcontractors and their employees."
The problem with Plaintiffs' argument is this: Contract provisions that would furnish a scintilla of evidence showing a right of control by the contractor/premises owner *Page 964 
(Particle Board) are the same provisions that would also furnish a scintilla of evidence upon which a jury could infer that Particle Board was contractually obligated to Plaintiffs with respect to the supervision and enforcement of safety. In other words, if there is insufficient evidence by specific contractual provision to show retention of the right to control some work, there is also insufficient evidence of Particle Board's obligation to do that same work. If Particle Board specifically contracted to supervise and ensure safety on the construction project, certainly, to that extent, retention of the right of control is necessary in order to fulfill that obligation. The Court in both Pate and Weeks scrutinized contracts with provisions very similar to the contract entered into by Particle Board. Yet, in each case the Court concluded the evidence was insufficient to present a jury question as to reserved control.
Plaintiffs rely upon several contract provisions as evidencing Particle Board's contractual duty to supervise and enforce safety. While we will not attempt to address every provision, a discussion of the principal provisions bearing on this issue is warranted. Article 3 states:
"3. PURCHASER AND CONTRACTOR.
 "3.1 The Purchaser, being in the first instance the interpreter of the Contract and the judge of its performance, shall use powers under this Article to enforce faithful performance of the Contract by both parties hereto. The Contractor shall, however, have complete control of its own organization.
 "3.2 Time is of the essence for the Contract and if at any time and from time to time during the progress of the work any of the Contractor's plant, machinery or equipment or any of its methods of executing the work appear to the Purchaser to be unsafe, inefficient or inadequate or should the Contractor not be proceeding with the work with sufficient force to ensure its progress and completion in accordance with the terms of the Contract, the Purchaser may
order and direct the Contractor to improve its plant, materials, equipment or methods or to put on and employ such additional force as shall be, in the judgment of the Purchaser, necessary to ensure the progress and completion of the work. The preceding shall in no way relieve the Contractor of its obligations under the terms of the Contract."
(Emphasis added.)
It is difficult for us to see how Mitchell (Contractor) "shall . . . have complete control of its own organization," but at the same time relinquish that control so that Particle Board (Purchaser) could supervise and enforce safety for the employees of Mitchell. Additionally, section 3.2 creates theright, but not the obligation, to remedy unsafe conditions.
Articles 10.1 and 38 of the contract state:
 "10.1 The Contractor shall comply with all laws, ordinances, rules and regulations bearing on the Contract. If the Contractor observes that the drawings and/or Specifications are at variance therewith, it shall promptly notify the Purchaser in writing. If the Contractor furnishes any work which is not in conformance with such laws, ordinances, rules and regulations and without notice to the Purchaser, it shall bear all costs arising from the correction thereof."
 "38. All equipment and work practices shall conform to all industrial safety regulations, including but not limited to, the Walsh-Healy Act, the Occupational Safety and Health Act (OSHA) and Federal, State and Local authorities having jurisdiction."
We cannot read these provisions as requiring Particle Board to enforce safety — they merely require Mitchell to abide by the law in performance of the contract.
Other relevant provisions of the contract are:
"7. PROTECTION OF WORK AND PROPERTY AND RISK OF LOSS
 "7.1 The Contractor shall protect the work of other Contractors, the Purchaser's property and adjacent property from any damage arising from the *Page 965 
execution of this Contractor's operations. The Contractor shall provide safeguards as required around all places of danger.
". . . .
"12. RELATIONS OF CONTRACTOR AND SUBCONTRACTOR
 "12.1 The Contractor shall be as fully responsible for the acts and omissions of its Sub-Contractors, and of persons either directly or indirectly employed by them as he is for the acts and omissions of persons employed directly by it.
". . . .
"16. SUPERINTENDENCE AND SUPERVISION
 "16.1 The Contractor shall provide effective supervision of the work through a full-time resident superintendent and any necessary assistants, all satisfactory to the Purchaser. The Superintendent shall not be changed during performance of the Contract without the Purchaser's written consent. Such superintendent shall represent the Contractor and all directions given to him shall be binding upon the Contractor.
"17. EMPLOYEES
 "17.1 The Contractor shall not employ on the work any unfit person or anyone not skilled in the work assigned to him.
 "17.2 The Purchaser shall have the right to require any workman or employee of the Contractor found by the Purchaser to be incompetent or undesirable to leave the premises at once.
". . . .
"20. INSPECTION OF WORK
 "20.1 The Purchaser shall, at all times, have access to the work wherever it is in preparation or progress, and the Contractor shall provide facilities for observation thereof.
 "20.2 Inspection by the Purchaser shall in no way relieve the Contractor of its responsibility for the work.
". . . .
"34. EMERGENCIES
 "34.1 The Purchaser has authority in an emergency to stop the progress of the work whenever in its opinion such stoppage may be necessary to ensure the safety of life, or of the structure, or neighboring property. This includes authority to make such changes and to order, assess and award the cost of such work extra to the Contract or otherwise as may in its opinion be necessary."
After careful consideration of these provisions, and after their comparison with similar provisions in the contracts inPate and Weeks, we cannot conclude that Particle Board was contractually obligated to supervise and ensure safety in the performance of its contract with Mitchell.
 2. Did either MacMillan or Particle Board voluntarily undertake to provide for the safety of Plaintiffs?
An analysis of the principles of voluntary undertaking in our case law, along with a detailed consideration of the strongest evidence from which a voluntary undertaking could be reasonably gleaned, is essential to our inquiry. The Pate Court, reviewing a closely analogous claim, set forth the applicable principles:
 "Appellants argue a second theory of recovery based on USS's alleged undertaking to inspect the premises for safety and doing it negligently, citing several cases recognizing this tort of negligent inspection. Hughes v. Hughes, 367 So.2d 1384 (Ala. 1979), and United States Fidelity and Guaranty Co. v. Jones, 356 So.2d 596 (Ala. 1977). In Hughes, 367 So.2d at 1387, this Court stated, `In a suit of this type the complainant must prove that the defendant had (1) undertaken to inspect the construction site, particularly the area in which the injury-causing hazard is located, (2) performed such inspection negligently, and (3) that such negligence was the proximate cause of his injuries.' (Emphasis added.) By their own concession, appellants are barred from recovering on this theory; they recognize the trial court's finding that USS made no safety inspections of the work site. Without an undertaking to inspect, no *Page 966 
duty arises. The trial court properly acknowledged this in its granting of directed verdict to USS.
 "However, appellants argue on appeal that USS was negligent in its failure to inspect for safety in the first place. No authority is cited for this unique proposition. Yet, appellants argue that several factors in the instant case support such a theory. The contract and specifications required Foster to comply with the applicable safety regulations and a safety manual provided by USS. The contract allowed USS to make inspections to ensure compliance with the contract and its specifications. USS engineers testified that, if they saw an unsafe condition, they would point it out to Foster, which was part of their duties under the contract. Such evidence merely indicates that USS had the right, not the duty, to inspect the premises to ensure that Foster complied with its duties under the contract, including work safety. Without an undertaking to inspect for safety, this does not alter the relationship of owner-independent contractor. See Ex parte Board of School Com'rs, 235 Ala. 82, 178 So. 63 (1937)."[1]
We must examine the evidence in light of the law of negligent undertakings in order to determine whether there was any evidence furnishing some inference upon which reasonable jurors could have concluded there was a voluntary undertaking to enforce, inspect, or supervise safety and that such undertaking was performed negligently.
 "Alabama clearly recognizes the doctrine that one who volunteers to act, though under no duty to do so, is thereafter charged with the duty of acting with due care and is liable for negligence in connection therewith." Dailey v. City of Birmingham, 378 So.2d 728, 729 (Ala. 1979).
This Court's recognition of the voluntary undertaking doctrine leaves unanswered, however, the question whether the actions of MacMillan or Particle Board constituted a voluntary undertaking, thus imposing "the duty of acting with due care and [liability] for negligence in connection therewith." Daileyv. City of Birmingham, 378 So.2d 728 at 729. In cases where a voluntary undertaking has been found, either direct or indirect participation in the injury-causing hazard or inspection of the injury-causing instrumentality has been supported by some evidence. For example, in Hughes v. Hughes, 367 So.2d 1384
(Ala. 1979), a scaffold-injury case (cited in Pate), the Court stated:
 "USF G, as the Workmen's Compensation carrier for Daniel, had the right to inspect the construction site and facilities for hazardous conditions in an effort to reduce compensation claims. It is clear from the evidence that USF G had made inspections on a regular monthly basis for several years prior to the subject accident. It also appears that the scaffold area was periodically inspected.
 "In his complaint, Hughes alleged that USF G had undertaken to inspect the project and provide safety engineering services but that USF G had `negligently failed to perform said safety engineering service properly, and that said defendant's said employee or employees knew of the unsafe or dangerous condition of said scaffold and the dangerous conditions occasioned by non-sufficient light, and negligently failed to render said scaffold and lights upon which plaintiff was invited to work in a reasonably safe condition.'
". . .
 "USF G discovered and reported the very hazard which resulted in the Hughes fall. We are of the opinion that Hughes failed to introduce even a scintilla of evidence that he was injured as a result of USF G's negligent inspection; therefore, *Page 967 
the trial court did not err in granting a directed verdict in favor of USF G." 367 So.2d at 1387-88.
In Alabama Power Company v. Henderson, 342 So.2d 323 (Ala. 1976), plaintiff brought an action against the utility company for injuries sustained when freshly poured concrete fell on him while he was employed by a company that was performing construction work for defendant. The Court stated:
 "Alabama Power Company contends the evidence was insufficient to sustain a jury finding that it breached a duty owed plaintiff, as a proximate consequence of which he was injured. It admits responsibility for the kind of ingredients used in mixing the concrete and the quantity of each. It maintained employees at the concrete mixing plant to continuously check the mixture for suitability for use on this particular job; also maintained an employee at the construction site who supervised the pouring of the concrete at all times, and periodically checked the concrete for rate of hardening.
". . .
 "The evidence tended to show APC had great authority, control and supervision over the construction of the stack; evidenced by its contract with Custodis and by maintaining, through its employees, close supervision over the mixing and pouring of the concrete. The ultimate test of defendant's duty to use due care is the foreseeability of the harm which would result if due care was not exercised. Under the evidence APC was chargeable with knowledge: of the suitability of the forms for holding concrete; that the addition of plastiment retarded the rate of hardening of concrete, and failure of the concrete to harden properly would allow hydrostatic pressure to build and result in failure of the forms. The evidence was sufficient to authorize the jury to find APC owed a duty to Henderson which it breached and his injuries resulted." 342 So.2d at 325-26.
After carefully considering the evidence in the present case, in light of the relevant case law, we are unable to find any evidence that could furnish some inference upon which the jury could have reasonably found a voluntary undertaking by either MacMillan or Particle Board to supervise, enforce, or inspect for safety. Therefore, we do not reach the question whether the defendants were negligent in this regard.
No evidence was adduced that anyone from MacMillan or Particle Board either 1) attempted to control or supervise the manner of the work performed by Mitchell; 2) participated in the procurement or assembly of the scaffold; 3) inspected the scaffold area for safety violation; or 4) attempted to enforce the safety rules and regulations upon Mitchell employees.
It is true that MacMillan and/or Particle Board may have had the right to enforce safety under the contract if they saw safety violations, but this alone does not constitute a voluntary assumption of that duty. Nor do we find any merit in Plaintiffs' contention that the drafting of contracts containing safety provisions, as well as the negotiations and awarding of these contracts, constitutes an undertaking to enforce safety. Our cases require more than this.
None of the testimony referred to indicates anything other than attempts by MacMillan Bloedel and/or Particle Board to monitor the progress of the work and ensure proper adherence to the plans and specifications for the building. In fact, it would be hard to envision a large project of this nature without such activity on behalf of the owner or general contractor.
As a basis for liability, however, that activity must be of the nature, and rise to the level, of a voluntary undertaking with respect to the safety of the injury-causing instrumentality. That is, it must be the activity of one who volunteers to act, although under no duty to do so, in connection with the safety inspection of the occupational risks made the basis of the claim. United States Fidelity andGuaranty Co. v. Jones, 356 So.2d 596 (Ala. 1977). To allow imposition of a legal duty of safety inspection upon either MacMillan or Particle Board for maintaining employees on the *Page 968 
construction site to monitor contract compliance, as regards the progress and performance of the work, would be unjust and constitute an unwarranted extension of existing case law.
The judgments against MacMillan Bloedel and Particle Board are also due to be reversed and judgment rendered in their favor.
REVERSED AND RENDERED AS TO ALL APPELLANTS.
All the Justices concur except FAULKNER and EMBRY, JJ., who concur specially.
[1] Admittedly, the last-quoted paragraph relates more specifically to the contractual theory of recovery than to the theory of voluntary undertaking; but this language is intended here, because the arguments in support of the respective theories of recovery in the instant case and in Pate are closely analogous.