Plaintiff James D. Robinson appeals from the judgment of the Jefferson Circuit Court in favor of all defendants. We affirm.
Robinson was employed by Fleck, Inc., a corporation that manufactured and sold fishing lures. In September 1976, the corporate stock of Fleck was sold, with the purchase agreement listing Robinson and defendant Howard Edelman as purchasers. The entire purchase amount was provided by Edelman and defendant Hank Roberts (the individual). Although Robinson did not provide any money for the purchase of stock in Fleck, he was apparently instrumental in negotiating the purchase of Fleck. Robinson received one-third of the total number of shares of Fleck stock, and Edelman received two-thirds of the shares. In January 1977, Edelman transferred his shares in Fleck to Hank Roberts, Inc., a business located in Colorado in which Roberts and Edelman were principals. *Page 959 
Robinson managed production and sales for Fleck, but he was not involved in the financial management of the company. Robinson served as an officer and director of Fleck. Fleck obtained a line of credit from defendant Central Bank of the South (hereinafter "Central Bank"). Edelman and Robinson signed as continuing guarantors of any indebtedness of Fleck to Central Bank. Fleck obtained several loans from Central Bank, all of which were eventually repaid by Fleck or by Edelman and Roberts.
Robinson attempted to purchase the shares of Fleck held by Hank Roberts, Inc., in early 1980, but his offer was refused. In April 1980, Robinson resigned as an officer and director of Fleck and shut down the operations of Fleck. The assets of Fleck were sold in 1981 to a Massachusetts businessman.
Robinson filed suit in August 1984, alleging that the defendants wrongfuly converted the assets of Fleck; that they misappropriated Fleck funds to their own uses; that they fraudulently diverted corporate assets; that they breached their fiduciary duties as officers and directors of Fleck; that they appropriated for themselves business opportunities belonging to Fleck; that they conspired to divert the assets of the corporation; and that they disposed of corporate assets without authorization. Robinson sought damages for lost wages, lost profits, lost opportunity to make a profit, and loss of the value of his investment in the company. In addition, Robinson claimed that he had suffered emotional distress and injury to his business reputation as a result of the alleged actions of the defendants.
The trial court granted summary judgment in favor of all defendants on all claims asserted by Robinson, except the conversion claim, finding that the claims were barred by the applicable one-year statute of limitations of Code 1975, § 6-2-39.[1] With regard to the conversion claim, the trial court granted summary judgment in favor of Central Bank. The trial court found that Robinson had failed to state a claim upon which relief could be granted concerning conversion of Fleck's assets because Robinson brought an action for personal recovery for conversion rather than a derivative action on behalf of the corporation as provided by Rule 23.1, A.R.Civ.P.
The sole issue on appeal is whether Robinson's affidavit in opposition to the defendants' motions for summary judgment, which affidavit conflicted with Robinson's prior deposition testimony, was sufficient to raise a genuine issue of material fact. The trial court determined that Robinson's affidavit was not sufficient to raise factual issues due to the conflicting testimony, as shown by the following excerpt from the trial court's order:
"In part, Robinson's affidavit provides that in March of 1984, he discovered for the first time the following facts upon which his complaint is based:
 " '(a) A $500,000 loan from Central Bank of Birmingham, Account No. 104592, which was made without corporate authorization nor notice to me. Said $500,000 did not go into the business of Fleck;
 " '(b) A $50,000 loan from Central Bank of Birmingham, Account No. 104593, which was made without corporate authorization nor notice to me. Said $50,000 did not go into the business of Fleck;
 " '(c) K.G. Roberts, a California corporation that manufactured sling shots, was purchased by defendants at the approximate time that the loans referred to in (a) and (b) above were made. The "G." in K.G. Roberts refers to the defendant, Greer;[2]
" '. . . .
 " '(f) Checks drawn on Central Bank from the corporate account of Fleck signed by defendant, Howard Edelman, *Page 960 
in the total amount of $113,700 payable to Columbia Savings Loan Association, a Colorado savings and loan. There was no corporate authorization nor notice to me of these matters. Fleck did no business with that bank. Further, it was agreed that only loan notes, but not those referred to in (a) and (b), insurance premiums and taxes, were to be paid by the defendants in Colorado;'
"Several of these statements in Robinson's affidavit of January 2, 1986, are in direct contradiction to Robinson's testimony in his May 30, 1985, deposition. For example, the following excerpts from Robinson's deposition directly and expressly contradict the statements in his affidavit:
 " 'Q. So you don't think Central should have made this second loan, is that what you're saying?
 " 'A. I don't think they should have made a $500,000 loan to — I don't think they should have made the $150,000 loan based on the gross that we was grossing at that time in view of the way it turned out, because I didn't get to use any of the money to produce products with anyway.
 " 'Q. Did you go tell Central at the time they were making the loan that you didn't think they ought to do it?
" 'A. No.
 " 'Q. Did you ever go tell Central you didn't think they should make any of these loans?
" 'A. Yes.
" 'Q. When?
 " 'A. In 1979, I told — when Chuck Greer was questioning me as to the figures in the statements and all and asked me if I was going to be able to pull that off, and I told him, no, that I was not, that I did not agree with going in for an additional $50,000 loan when I had just learned that the other loan — none of the principal had been paid on it, and that I definitely didn't feel like that we needed another $50,000 because it was only going to get us in more deeper trouble.
" '. . . .
 " 'Q. Is it correct that as we sit here today you cannot tell me one fact supporting your charge that Central Bank diverted these funds from the corporation?
 " 'A. On the strength of Chuck Greer stating to me on two different occasions that he owned fifty to fifty-one percent of the K.G. Roberts stock, and then immediately the $150,000 loan is made, and that money was not used in the corporation down here, in this Birmingham operation.
" 'Q. All right. Now, when did Chuck —
" 'A. I don't know what happened with the money.
" 'Q. When did Chuck Greer tell you this?
 " 'A. Somewhere around — it was in the latter part of 1979, somewhere around September or October, somewhere in that bracket.
" 'Q. Almost six years ago?
 " 'A. When he was fixing to approve another $50,000 loan.
" 'Q. So he told you in 1979?
" 'A. That's correct.
" 'Q. And you have known that ever since?
" 'A. Yes, I have known it ever since.
 " 'Q. And that caused you to believe that money was diverted?
 " 'A. That — yes. That was — the fact that he was up there staying with Howard Edelman, and then all of a sudden we did not get the loan. A year later then we did have the loan. Then they purchased the K.G. [Roberts] Corporation. He says he owns fifty percent of the stock of the corporation.
" 'Q. And when did you know all of these facts?
 " 'A. Well, I — in the latter part of '79 with Chuck Greer. It was in June or July of '79 when I learned that in fact the $150,000 had been made, back in the latter part of '78, of which I had been lied to that it had not been made.
" 'Q. You have known that since then?
" 'A. Known what since then? *Page 961 
 " 'Q. You have known about this loan and you have known about Chuck Greer saying he owned stock?
 " 'A. I knew — I did not know in fact that the loan had been made until somewhere around the middle of June or July of '79. I didn't know it for a fact then. I only knew that Howard Edelman said that it had been. I didn't know for a fact until I finally got a copy of it.
 " 'Q. But you had been told by Howard Edelman, one of the defendants, that the loan had been made, and you had been told that in '79?
 " 'A. Yes, and that all the money was gone, but I did not see any documentation or anything at that time.
" '. . . .
 " 'Q. What facts, whether documented or not, do you have to support that allegation you just made on the record that they diverted money from Fleck and put it in another company?
 " 'A. Well, I know that Edelman says that Greer spent two or three days with him up there at his home and then all of a sudden the $150,000 loan I later learned was approved and made. Immediately after this they buy the K.G. Roberts Corporation. Chuck Greer admits to me that he owns it because he got very, very scared when I refused to identify some of the figures in '79 when they were applying for another $50,000 loan.
 " 'Q. When did Charles Greer admit to you that he was an owner in some company?
 " 'A. It was the latter part of '79 when they was — when Howard Edelman had applied for an additional $50,000 loan in addition to the $150,000, which none of the principal had been paid.
" '. . . .
 " 'Q. And so when Mr. Resha filed the suit in 1984, that was approximately four years after you had wanted Mr. Norwood to file basically the same suit?
" 'A. Yes.'
". . . .
"It is not certain that the loans referred to in Robinson's affidavit testimony are the specific loans cited in the excerpts from his deposition testimony. In any event, Robinson's deposition testimony indicates unequivocally that he was aware that extensive loans were being taken out by the corporation. He also testified that he objected to those loans in 1979. Such explicit statements expressly undermine his affidavit testimony that he did not discover the facts upon which his complaint is based until 1984."
We agree that the statements in Robinson's affidavit are insufficient to preclude summary judgment, because they do not create a genuine issue of material fact. Rule 56, A.R.Civ.P. The affidavit is totally inconsistent with Robinson's deposition testimony regarding the time when he discovered the facts on which he bases his claims. The following language found in Van T. Junkins Associates,Inc. v. U.S. Industries, Inc., 736 F.2d 656, 657 (11th Cir. 1984), is applicable:
 "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."
See also Radobenko v. Automated Equipment Corp.,520 F.2d 540 (9th Cir. 1975); Perma Research DevelopmentCo. v. Singer Co., 410 F.2d 572 (2d Cir. 1969). Robinson cannot be allowed to create an issue of fact by providing an affidavit that contradicts, without explanation, his prior deposition testimony.
Robinson contends that he did not learn of thespecific facts on which to base a lawsuit until he received access to corporate records in March 1984. The record amply shows, however, that Robinson was aware of facts on which his claims are based more than one year prior to filing his complaint. Robinson's fraud action is barred by the limitation of Code 1975, § 6-2-39. The saving provision of Code *Page 962 
1975, § 6-2-3,[3] allowing a party one year from the discovery "of the fact constituting the fraud" in which to bring a fraud action, is not applicable under the evidence in this case. Fraud is deemed to have been "discovered" when "the party actually discovered the fraud, or had facts which, upon closer examination, would have led to the discovery of the fraud." Kelly v. Smith, 454 So.2d 1315, 1317
(Ala. 1984). From his deposition testimony, it is apparent that Robinson had knowledge of facts, more than one year before filing suit, that would, upon examination, have led him to the discovery of the fraud.
Robinson's claims for breach of fiduciary duty likewise are barred by Code 1975, § 6-2-39. Pines v. Warnaco,Inc., 706 F.2d 1173 (11th Cir. 1983); see JeffersonCounty v. Reach, 368 So.2d 250 (Ala. 1978).
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, ALMON, SHORES and ADAMS, JJ., concur.
[1] Section 6-2-39, Code 1975, was repealed effective January 9, 1985, and those actions governed by its one-year limitations period were transferred to § 6-2-38, the two-year statute. See Act 85-39, Alabama Acts, Second Special Session, 1984-85. The claims in the present case were barred before the effective date of Act 85-39.
[2] Chuck Greer was an employee of defendant Central Bank.
[3] Section 6-2-3 was amended, effective January 9, 1985, to extend its one-year saving clause to two years.