This is a premises owner liability case in which a summary judgment was entered in favor of the defendant, Alabama Power Company.[1] *Page 603 
Alabama Power contracted with Combustion Engineering, Inc., and other contractors in the spring of 1985 for maintenance work at Alabama Power's Gorgas steam plant during a scheduled maintenance outage. Tittle, an ironworker, was hired by Combustion Engineering to work on that job. While working at the plant Tittle allegedly slipped on insulation dust that was on the plant floor and fell, injuring his neck and back. He later filed an action against Alabama Power and the insulation contractor.[2] Tittle alleged that Alabama Power exercised the right to control the employees of Combustion Engineering on the job site and therefore had a duty to ensure that he had a safe workplace. He alleged that Alabama Power breached its duty by allowing the insulation dust to remain on the floor and thereby proximately caused his fall.
Alabama Power filed a motion for summary judgment, stating that it was merely the premises owner and therefore was under no duty to provide Tittle with a safe workplace. Alabama Power contended that the contract between it and Combustion Engineering made the latter responsible for the safety of its own employees, and Alabama Power denied that it retained or exercised any right of control over the manner in which Combustion Engineering's employees performed their work. The trial court granted Alabama Power's motion, and Tittle appeals. He argues that he presented evidence showing that Alabama Power exercised control over the manner in which Combustion Engineering's employees worked, thereby incurring the responsibility for providing him with a safe workplace.
The general rule regarding the duty owed by premises owners to independent contractors and their employees is settled:
 "[A] premises owner owes no duty of care to employees of an independent contractor with respect to working conditions arising during the progress of the work on the contract. 'The general rule does not apply, however, if the premises owner retains or reserves the right to control the manner in which the independent contractor performs its work.' Thompson v. City of Bayou La Batre, 399 So.2d [292] at 294 [(Ala. 1981)]; Hughes v. Hughes, 367 So.2d [1384] at 1386 [(Ala. 1979)]. 'When the right of control is reserved, the relationship changes from one of premises owner and independent contractor to that of master and servant.' 399 So.2d at 294.
 "A master-servant relationship is not created, however, when the owner merely retains the right to supervise or inspect work of an independent contractor as it progresses for the purpose of determining whether it is completed according to plans and specifications, and retains the right to stop work that is not properly done. Pate v. United States Steel Corp., 393 So.2d [992] at 995 [(Ala. 1981)]."
Weeks v. Alabama Electric Cooperative, Inc., 419 So.2d 1381,1383 (Ala. 1982) (emphasis in original).
In this case the contract between Alabama Power and Combustion Engineering unambiguously assigned the duty of supervising Combustion Engineering's employees to that company. However, this Court's inquiry does not end after examining the contract between the parties; their conduct must also be considered. Alabama Power had a number of "area coordinators" present on the job site to see that the contractors were performing their work in compliance with the specifications in the contracts. Those coordinators were supervised by Steve Ferguson, the assistant maintenance superintendent in charge of the outage at the Gorgas plant. This Court, recognizing that ensuring such compliance is a legitimate concern for the premises owner, has held that this type of supervision does not create a master and servant relationship. Weeks, supra; Pate v.United States Steel Corp., 393 So.2d 992, 995 (Ala. 1981). However, the scope of supervision that can be exercised is limited *Page 604 
to protecting the owner's interest in seeing that the results contemplated by the contract are achieved. Id.
If the premises owner exercises control over the means and manner in which the work is performed, the owner-independent contractor relationship is converted to that of master and servant, because an independent contractor relationship exists only if the person doing the work and said to be the independent contractor is subject to the will of his employer, i.e., the person for whom he has contracted to do the work, only as to the result, but not as to the manner of achieving that result. Sawyer v. Chevron USA, Inc., 421 So.2d 1263 (Ala. 1982); 41 Am.Jur.2d Independent Contractor § 8, at 751-52 (1968).
Tittle's motion in opposition to Alabama Power's motion for summary judgment was supported by affidavits by Tittle and Thurman Nichols, his foreman. In those affidavits both men stated that Alabama Power employees gave instructions to Combustion Engineering employees regarding how to perform their work. Alabama Power filed a motion to strike those affidavits, arguing that they contradicted earlier deposition testimony by Tittle and Nichols and for that reason could not be used to create a question of fact to defeat its motion for summary judgment. The court ruled that motion moot on the same day it entered summary judgment for Alabama Power. Tittle argues that the affidavits, together with other evidence, provided a proper basis for denying summary judgment.
This Court has held that when a party to an action has given clear answers to unambiguous questions that negate the existence of any genuine issue of fact, that party cannot later create an issue of fact by submitting an affidavit that directly contradicts, without explanation, that earlier testimony. That rule is based on the concern that such an affidavit might be a sham. Robinson v. Hank Roberts, Inc.,514 So.2d 958, 961 (Ala. 1987); Lady Corinne Trawlers v. ZurichIns. Co., 507 So.2d 915, 917-18 (Ala. 1987); See also Van T.Junkins Associates, Inc. v. U.S. Industries, Inc.,736 F.2d 656, 657 (11th Cir. 1984).
Nichols was not a party to this action, and to date this Court has applied the rule stated in Robinson and Lady CorinneTrawlers only to parties, recognizing the motivation they might have to fabricate a sham affidavit. There is no reason to assume that disinterested third parties possess the same motive, and thus, the logic that supports the application of the rule to parties is not present. Even assuming that the rule could be applied to affidavits of non-parties in some instances, it is not applicable here, because Nichols's affidavit did not contradict clear answers to unambiguous questions in his deposition.
Alabama Power cites the following two questions and answers from Nichols's deposition:
 "Q. At any time were you given any directions directly by an Alabama Power Company employee?
"A. No.
 "Q. And I gather that at no time were any members of your crew ever given any directions by Alabama Power Company employees?
"A. Not to my knowledge."
It says that Nichols contradicted these answers by stating in his affidavit that Alabama Power employees would stop work in progress and direct that it be done another way.
The alleged contradiction diminishes to insignificance for purposes of the above-cited rule, however, when the deposition answers are considered in context and the affidavit is examined. The pertinent portion of the deposition reads:
 "Q. Was anybody from Alabama Power Company up in the area that you've diagrammed around the boiler or the feed water tanks?
 "A. There was a constant flow of Alabama Power people by and around. As indicated on the map or the sketch, there's a ramp which leads to — I believe it's unit number five or eight, I'm not sure, and it's a main walkway to the elevator, which is on the left-hand side of *Page 605 
the sketch, which is your main transportation to and up through the building. It's my understanding that the people from Alabama Power were people that worked in the tool room and the shop, and those were the people that were supervising the work.
". . . .
 "Q. I see. Now, you said a moment ago that there were power company employees who were supervising the work being done?
"A. That's true.
 "Q. Do you mean that they were power company engineers who were in the area to see how the work was progressing?
 "A. No, I don't mean the engineers, I mean that worked there in the boiler room and the turbine floor and some out in the machine shop were the people that were supervising.
 "Q. Well, you've testified that the only directions given to you were given by Jeff Jeffers —
"A. That's true.
"Q. — pertaining to job assignments —
"A. Yes.
"Q. — and work that was to be done?
"A. That's true.
 "Q. You've testified that the only directions given to your crew pertaining to the work to be done were given by you?
"A. That's true.
 "Q. And I would take it that as far as you know, the only directions given to any other craft crew from CE were given by that crew foreman —
"A. That's true.
"Q. — who was a CE employee?
"A. That's true.
 "Q. So, when you say that the power company people were there supervising the work, you don't mean to say that they were giving directions to CE employees on how to do the job?
 "A. No. What I mean to say is that if a job was not progressing as they like for it to progress or in the way they wanted it to, the Alabama Power personnel in that area would go to Jeffers and then in turn Jeffers would come back with that particular man and solve the problem.
"Q. I see.
 "A. So in that sense, they were giving the directions to Jeffers.
 "Q. What they were doing then was monitoring the work, and if they saw something that they thought was not being done the way it was supposed to be done, they went to Jeffers?
 "A. Not necessarily the way it was supposed to have been done. If they didn't think it was going the way they wanted it to go.
 "Q. I understand. And they went to Jeffers and Jeffers came down to you?
"A. Right.
 "Q. At any time were you given any directions directly by an Alabama Power Company employee?
"A. No.
 "Q. And I gather that at no time were any members of your crew ever given any directions by Alabama Power Company employees?
"A. Not to my knowledge.
 "Q. One last question. The safety directives that you would discuss at your safety meetings that came down from CE, were those directives CE safety rules?
 "A. Not only CE safety rules but incorporated would be Alabama Power safety rules. I believe Alabama Power at that time had a safety man on the project."
(Emphasis added.)
Thus, Nichols stated in his deposition that he did not personally receive orders directly from Alabama Power employees and that he was not aware of such orders having been given directly to his crew, but that Alabama Power employeeshad directed Combustion Engineering's superintendent, Jeff Jeffers, in the manner of performance. These statements were not contradicted in his affidavit, which reads:
 "My name is Thurman Nichols and I am over the age of nineteen and of sound mind. I worked at the Gorgas Steam Plant during the power outage from March to May of 1985. It ran approximately eight weeks. I am an iron worker *Page 606 
by trade. I have been an iron worker for over thirty years. I was the foreman on this job. I worked for Combustion Engineering, Inc. My direct supervisor was Jeff Jeffers. My job was to give orders to the individual members of the iron worker gang.
 "There was a constant flow of Alabama Power people by and around during the outage. These people were supervising the work. I don't mean the engineers, I mean the people that worked there in the boiler building and turbine floor and some out of the machine shop were the people that were supervising. These were Alabama Power Company employees. I gave the directions to my crew. I received my job assignments from Jeff Jeffers. Alabama Power Company had their men there the whole time of the outage, every minute of every day. They were watching what we were doing. They watched every nut and bolt go in. If the job was not progressing as they liked for it to progress or IN THE WAY THEY WANTED IT TO, they would go to Jeffers and in turn Jeffers would come back to me with that particular Alabama Power man in order to solve the problem. Then, all three of us were there to discuss the problems. It wasn't just something that they thought was not being done the way they thought it was supposed to be done. If they didn't like the way we were doing the job or they didn't think it was going the way they wanted it to go, they would come in and make us do it a different way. For example: If Alabama Power Company wanted platform steps in another direction to be made, an Alabama Power Company employee would come to me and tell me to get some people over there and get them built in another direction. Also, on one occasion, an Alabama Power man asked me to fabricate a set of portable steps for the tripper floor, approximately 50 inches high with a platform at the top. I had to stop fabricating roof sections for the plenum chamber of the boiler, to build these steps. Jeffers had assigned to us this work on the plenum chamber, various handrails and platforms throughout the boiler building, but not to fabricate any portable steps. That came from Alabama Power Company. This example is typical of what would happen on any given day. I would immediately pull my men off the job and move them, per the instructions, to the other jobs. I know that all my job assignments came from Jeff Jeffers. However, Alabama Power personnel and coordinators would be there every day to change my assignment if they wanted to.
 "Directions to my crew were given to me, normally, however, on occasion, if either I or J.J. were not around they would give direct orders to my crew members. For example: One time they wanted a piece of grading or handrail removed. They went directly to my crew and had them remove it. I also remember, for example, Alabama Power Company people allowed or caused Jessie Tittle to get a fire retention blanket and put over newly installed insulation so that Jessie wouldn't burn holes in it from the sparks from his welder. This was in the immediate area where Tittle fell.
 "As I stated in my deposition on pages 32, 33, 34, 35 and 36, there were Alabama Power Company employees giving directions to the workers on how to do their job. Alabama Power Company supervised where the [craftsmen worked]. They had Southeastern Insulation and Combustion Engineering workers working on top of one another. This made the area congested. It created the situation wherein Mr. Tittle was injured. Alabama Power Company controlled the flow of the workmen and the flow of the work progress."
(Emphasis in original.)
Nichols's affidavit was substantially consistent with his deposition testimony. Any inconsistencies between the two are not the sort of simple, direct contradiction regarding a material question of fact that has been held to preclude aparty from defeating summary judgment solely by his own affidavit.
Nor is Tittle's affidavit due to be excluded, because no material contradictions *Page 607 
exist between his deposition testimony and his affidavit. Tittle gave the following responses during his deposition:
 "Q. Do I understand your testimony also that you never received any directions from Alabama Power Company employees while you were at the Gorgas plant?
 "A. Would you say that again? Would you repeat that?
 "Q. I will be happy to ask the question a different way. You stated earlier that you and your co-employees did not talk with the Alabama Power Company personnel, is that correct?
"A. I can only speak for myself.
"Q. And it is your testimony that you did not?
 "A. The only Alabama Power personnel that I remember speaking to is the guard at the entrance, and I had no other way. You had to say something to him when you got through the gate.
 "Q. All right, sir. Do I, therefore, understand it to be your testimony that Alabama Power Company employees did not direct the way you did your job?
 "A. I wouldn't know. Here again, the only thing I am going to testify to is that they have not talked to me."
(Emphasis added.) Tittle stated the following in his affidavit:
 "Alabama Power Company employees were all over the site. They controlled all of the work that was being done by the crafts. No one from Alabama Power talked to me personally; however, I have overheard them give instructions to members of my crew. In fact, one time they issued an order that we had to cover fresh insulation with a fire retardant blanket so our welding sparks would not burn the insulation.
 That order was not given directly to me but given in general to the group where I was working. I went and got the blanket. . . . They also instructed our group to put a board over an acetylene torch and to move out a line from the torch hose. These are some specific instructions that I can remember. Several instructions were given like these. All of these instructions concern the manner in which we did our work."
(Emphasis added.) Because Tittle had limited his deposition responses to orders that were given directly to him, his affidavit did not directly contradict that testimony. Therefore, Alabama Power's motion to strike the affidavits was due to be denied. Robinson, supra; Lady Corinne Trawlers,supra.
Alabama Power argues that Tittle's and Nichols's affidavits provided only examples of attempts by Alabama Power employees to supervise progress or to stop unsafe acts on the job site, which, it argues, a premises owner may do without assuming a duty to ensure the safety of the independent contractor's employees. It argues that three decisions of this Court,Pugh v. Butler Telephone Co., 512 So.2d 1317 (Ala. 1987);Columbia Engineering Int'l, Ltd. v. Espey, 429 So.2d 955 (Ala. 1983); and Pate v. United States Steel Corp., supra, support that contention.
Pugh, Espey, and Pate did not concern an affirmative act of control or undertaking to provide a safe workplace by the defendant premises owner. In Pugh, this Court held that "There is no evidence in the record that [the premises owner] exercised any control or retained any right of control over the manner in which [the contractor] performed any of its work on the project." 512 So.2d at 1319. The Court also held that a contract between the owner and an engineer did not impose on either a duty of safety toward employees of the independent contractor. Id., at 1319-20. In Espey this Court found that there was no evidence that the defendant had voluntarily undertaken to ensure the plaintiff's safety. 429 So.2d at 967. As in Pugh, the defendant in Espey had a contractual right to enforce safety, but took no affirmative steps to exercise that right. Id. Similarly, in Pate, the owner had a contractual right to make safety inspections, but never exercised that right. In the absence of an affirmative act by the owner, this Court found no duty. 393 So.2d at 996. *Page 608 
The instant case is distinguishable from those three cases. There was evidence, cited above, tending to show that Alabama Power exercised the right to oversee safety and to correct hazardous conditions and that Alabama Power also took affirmative steps to control the contractors' work, thereby crossing the line from guaranteeing compliance with the contract into determining the means and manner in which Combustion Engineering performed its work.
In addition to Nichols's statements of extensive control and Tittle's statements that Alabama Power employees instructed his crew to perform their job more safely by covering insulation with a fire retardant blanket and instructed them on how to use and store a welding torch, there was other evidence tending to show that Alabama Power exercised control over the manner in which, and the means by which, Combustion Engineering's employees worked. For example, Steve Ferguson, the Alabama Power employee in charge of the maintenance outage, testified that Alabama Power reserved the right to bring unsafe work conditions to the contractor's attention and to stop work if it was necessary to do so in order to ensure safety.
Tittle testified in deposition that he had on several occasions seen an Alabama Power employee sweeping up insulation dust like that that he allegedly slipped on. There was evidence from the depositions of Ferguson, Tittle, and Nichols that Alabama Power employees often told the contractors' supervisors to interrupt their work and move to another job site. Most pertinently, there was evidence that on the evening before Tittle's accident, the insulation contractor's employees had been working on the site where he was injured; that they had gone to another site on the morning of the accident, inferentially at Alabama Power's direction; and that neither the insulation contractor nor Alabama Power had cleaned the site before Tittle was injured about 10 o'clock in the morning. Thus, there was at least a scintilla of evidence that Alabama Power either was negligent in not cleaning the area itself after having assumed a duty to do so or exercised control over the manner in which the contractors performed their work and failed to provide a safe place to work by allowing or directing the insulation contractor to move from one job area to another without requiring the contractor to clean the first area.
The degree of control exercised by Alabama Power as suggested by the record in this case is similar to that held sufficient to impose on the premises owner the duty to provide a safe workplace in Miller v. Degussa Corp., 549 So.2d 454 (Ala. 1989); see, also, Alabama Power Co. v. Jarman, 549 So.2d 7
(Ala. 1989); Alabama Power Co. v. Beam, 472 So.2d 619 (Ala. 1985); Alabama Power Co. v. Henderson, 342 So.2d 323 (Ala. 1976).
After reviewing the record in a light most favorable to the non-movant and resolving all reasonable doubts against the movant, as we must do when reviewing a summary judgment,Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala. 1986), we hold that there was a scintilla of evidence supporting Tittle's claim that Alabama Power reserved or exercised the right to control the manner of performance by the contractors and therefore had a duty to provide a safe workplace, and that it proximately caused his injuries by breaching that duty. Therefore, summary judgment was improper. The judgment is reversed and the cause is remanded to the trial court for proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX and ADAMS, JJ., concur.
STEAGALL, J., concurs in the result.
[1] Tittle's complaint was filed before June 11, 1987, and is therefore reviewed under the "scintilla rule." Ala. Code 1975, §12-21-12 (Supp. 1988).
[2] The insulation contractor is not a party to this appeal. *Page 609