[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1092 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1093 
 On Applications for Rehearing
This Court's opinion of April 9, 2004, is withdrawn and the following is substituted therefor.
The plaintiff, India Stovall, individually and on behalf of her minor children, David G. Stovall and Joel Stovall (hereinafter collectively referred to as "Stovall"), appeals from a summary judgment in favor of the defendant, Universal Construction Company, Inc., d/b/a Turner-Universal ("Turner"). Turner appeals from the dismissal of its third-party complaint against Penwal Industries, Inc. ("Penwal"). These appeals were consolidated. We affirm the judgment in Stovall's appeal (case number 1021938), and we reverse and remand in Turner's appeal (case number 1021953). *Page 1094 
Facts and Procedural History
In anticipation of the 30th anniversary of man's first landing on the moon, the U.S. Space and Rocket Center in Huntsville sought to construct and erect a replica of the Saturn V rocket, the rocket that carried the Apollo 11 astronauts ("the rocket"). The Alabama Space Leasing Corporation entered into an agreement with Turner, a Delaware corporation, pursuant to which Turner was to design and build the rocket replica. Turner subcontracted with Penwal, a California corporation, for the assembly and erection of the rocket. The subcontract provided that Penwal was to "perform and furnish all the work, labor, services, materials, plant, equipment, tools, scaffolds, appliances, and other things necessary for ASSEMBLY AND ERECTION OF SATURN V ROCKET." (Capitalization in original.)
The subcontract defined the rocket as including, among other components:
 "J. Rust inhibitive high quality paint on all exterior components on areas which may be exposed to rust.
 "K. Exterior skin to be pre-painted with high quality paint with approved primer including all prominent graphics to simulate Saturn V Rocket at U.S. Space and Rocket Center."
The subcontract also stated that Turner, as the general contractor, would "furnish temporary lighting for night shifts sufficient to allow assembly." Finally, the subcontract listed several components and jobs for which Penwal was not responsible, including "[t]emporary lighting or electrical."
Article XXIII of the subcontract is entitled "Liability for Damage and Personal Injury"; it reads:
 "The Subcontractor [Penwal] hereby assumes entire responsibility and liability for any and all damage of any kind or nature whatever (including death resulting therefrom) to all persons, whether employees of any tier of [Penwal] or otherwise, and to all property caused by, resulting from, rising out of or occurring in connection with the execution of the Work, or in preparation for the Work, or any extension, modification, or amendment to the Work by change order or otherwise. Except to the extent, if any, expressly prohibited by statute and excluding from this indemnity such acts or omissions, if any, of the party indemnified for which it is not legally entitled to be indemnified by [Penwal] under applicable law, should any claims for such damage or injury (including death resulting therefrom) be made or asserted, whether or not such claims are based upon [Turner's] or the Owner's [U.S. Space and Rocket Center's] alleged active or passive negligence or participation in the wrong or upon any alleged breach of any statutory duty or obligation on the part of [Turner] or the [U.S. Space and Rocket Center], [Penwal] agrees to indemnify and save harmless [Turner] and the [U.S. Space and Rocket Center], their officers, agents, servants and employees from and against any and all such claims and further from and against any and all loss, cost, expense, liability, damage, penalties, fines or injury, including legal fees and disbursements, that [Turner] and the [U.S. Space and Rocket Center], their officers, agents, servants or employees may directly or indirectly sustain, suffer or incur as a result thereof and [Penwal] agrees to and does hereby assume on behalf of [Turner] and the [U.S. Space and Rocket Center], their officers, agents, servants and employees, the defense of any action at law or in equity which may be brought against [Turner] and/or the [U.S. Space and Rocket Center], their officers, agents, *Page 1095 
servants or employees, upon or by reason of such claims and to pay on behalf of [Turner] and the [U.S. Space and Rocket Center], their officers, agents, servants and employees, upon demand, the amount of any judgment that may be entered against [Turner] and/or the [U.S. Space and Rocket Center], their officers, agents, servants or employees in any such action."
In addition, the subcontract required Penwal to obtain liability insurance. Penwal complied, obtaining insurance with Reliance Insurance Company ("Reliance"), a Pennsylvania corporation licensed to write policies in all 50 states.
In order to fulfill its responsibilities under the subcontract, Penwal contracted with Labor Finders of Decatur, Inc., to supply Penwal with painters. One of the painters Penwal hired through Labor Finders was Elee Stovall, the plaintiff's husband.
On June 19, 1999, Elee's first day on the job, he, his first cousin Maurice Stovall, and Kendrick Fuqua (hereinafter collectively known as "the painters") arrived in the evening to begin work. When they arrived, they were assigned to paint the interior walls of the rocket. The ladder was secured to the rocket by a lashing. The top of the rocket was open, so most of their painting was done by the light of the evening sky. After painting a particular section of the interior, the painters and some other men moved the ladder to another section of the interior. They did not secure the ladder with lashing once they moved it. It was around 10:00 p.m. when they moved the ladder, and the painters then took a break before starting work again.
The painters allege that it was very dark when they arrived back at the rocket after their break. They had two lighting trees at their disposal with which to illuminate the inside of the rocket. Each lighting tree had one working and one dead bulb. The ladder was resting where the painters had left it; it had not been tied off or secured in any way. Maurice Stovall took charge of the lighting trees, shining them on the various places that needed additional painting. Fuqua climbed up one side of the replica, hooked his lanyard onto the safety cable, and began painting. Elee then climbed the untied ladder, attempting to hook his lanyard onto the safety cable. He missed the connection, and as he reached to rehook the lanyard, the ladder shifted and Elee fell from the ladder. The back of his head hit an interior cross beam, and he landed on the concrete floor. Elee subsequently died from the injuries he suffered in the fall.
On June 1, 2001, Stovall sued Turner, alleging negligence/wantonness claims, a products-liability claim, and negligence/wantonness per se.
On October 3, 2001, the Commonwealth of Pennsylvania declared Reliance to be insolvent. On May 9, 2002, Turner brought a third-party complaint against Penwal seeking indemnity and defense in the action filed by Stovall. Penwal filed a motion to dismiss, arguing that because Reliance was insolvent, Penwal had no obligation to indemnify or defend Turner. The trial court dismissed the third-party complaint against Penwal on December 17, 2002.
On July 9, 2003, the trial court entered a summary judgment in favor of Turner on all counts in the action filed by Stovall. Because the summary judgment was a final judgment, see Rule 54(b), Ala. R. Civ. P., it also made appealable the trial court's December 17, 2002, dismissal of Turner's third-party complaint.
Stovall appeals the summary judgment in favor of Turner; Turner appeals the *Page 1096 
dismissal of its third-party action against Penwal.
I. Stovall v. Turner (case no. 1021938)
 Standard of Review
Our review of a trial court's summary judgment is de novo.Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74
(Ala. 2003). In reviewing the trial court's decision, we apply the following principles:
 "`The standard of review applicable to a summary judgment is the same as the standard for granting the motion, that is, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law. Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala. 1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala. 1986). See also Hanners v. Balfour Guthrie, Inc., 564 So.2d 412
(Ala. 1990).
 "`. . . Ala. Code 1975, § 12-21-12, mandates that the [nonmovant] meet [its] burden by "substantial evidence." Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Under the substantial evidence test the nonmovant must present "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989).'"
Williams, 886 So.2d at 74 (quoting Brewer v. Woodall,608 So.2d 370, 372 (Ala. 1992)).
 A. Inadequate Lighting
Stovall first argues that the trial court erred in entering a summary judgment because, she argues, genuine issues of material fact exist as to whether Turner negligently failed to provide adequate lighting. We find no merit to this argument.
At issue is the question of Turner's duty. Generally speaking, a contractor owes no duty to the subcontractor whom he has employed. Elder v. E.I. DuPont De Nemours Co.,479 So.2d 1243, 1248 (Ala. 1985); Knight v. Burns, Kirkley WilliamsConstr. Co., 331 So.2d 651, 655 (Ala. 1976). However, there are three recognized exceptions to this rule. First, the contractor is liable for injuries to a subcontractor's employee caused by the contractor's own negligence. Knight, 331 So.2d at 655. Second, a contractor is liable for injuries to a third person when the work being performed is "`of such kind or class that the doing of it, however carefully or skillfully performed, will probably result in damage, or is necessarily and intrinsically dangerous.'" Knight, 331 So.2d at 655 (quoting Baker v.Atlanta B. A. Ry., 163 Ala. 101, 105, 49 So. 751, 752 (1909)). Finally, a contractor "`is responsible for the manner of the performance of his nondelegable duties, though done by an independent contractor.'" Knight, 331 So.2d at 655 (quotingDixie Stage Lines v. Anderson, 222 Ala. 673, 675, 134 So. 23,24 (1931)).
As discussed above, Turner contractually agreed to furnish Penwal's employees with "temporary lighting for night shifts sufficient to allow assembly." However, Stovall does not allege a breach of contract. As Stovall's reply brief explains:
 "[Stovall is] not . . . seeking to hold [Turner] liable under a third-party beneficiary status. . . . Indeed, the Complaint contains no breach of contract allegations *Page 1097 as to [Turner]. . . . Rather, the provisions of the Subcontract concerning night lighting demonstrate that [Turner] retained possession and control over the provision of lighting for the premises. Therefore, [Turner] remains liable for its failure to provide adequate lighting, irregardless [sic] of any third party beneficiary analysis."
(Emphasis added.)
Stovall's argument is apparently that Turner retained possession and control over the lighting of the work area for the night shift and therefore had a duty of care to provide adequate lighting. Because Turner owned the light trees, Stovall has presented sufficient evidence of possession. What Stovall misapprehends, however, is that control, as it relates to determining whether a duty of care exists, refers to a party's reservation of the right to control the manner in which work is performed. Pate v. United States Steel Corp., 393 So.2d 992,995 (Ala. 1981). Stovall has failed to produce substantial evidence indicating that Turner reserved the right to controlhow Elee and his fellow painters used the lighting. Indeed, the very essence of the contractor/subcontractor relationship hinges on the contractor's allowing the subcontractor to do his work without interference. The mere fact that Turner contracted toprovide Penwal employees with lighting in no way translates into an automatic reservation of control over how that lighting is used.
Stovall points out that this Court, in Berness v. RegencySquare Assocs., Ltd., 514 So.2d 1346, 1348 (Ala. 1987), found, under the circumstances of that case, a duty to provide adequate lighting. In that case, a mall employee tripped and fell over loose concrete on the sidewalk outside the mall building. The exterior lights were not on when she fell. However, in Berness, the lighting was clearly on the mall premises, and the management had indisputably reserved the right to control, and in fact did control, the manner of lighting the exterior premises. Berness, 514 So.2d at 1347. Thus Berness is distinguishable and does not support the finding of a duty of care to provide adequate lighting in this case.[1]
We conclude that Stovall has failed to provide substantial evidence showing that Turner owed any duty to provide the painters adequate lighting.
 B. Failure to Provide a Safe Workplace
Stovall next argues that the trial court erred because, she says, genuine issues of material fact exist as to whether Turner (1) retained possession or control of the premises, i.e., the workplace, and thus (2) breached a duty to provide a safe workplace. This argument fails also.
The duty to provide a safe workplace is a statutory duty imposed upon employers by § 25-1-1(a), Ala. Code 1975. Although the statute provides a broad definition of employer,[2] and although this Court has previously characterized a general contractor's relationship with his subcontractor as one of master and servant,[3] *Page 1098 
we have consistently maintained that the critical issue is whether the defendant has retained possession and control over the premises. Procter Gamble Co. v. Staples, 551 So.2d 949,953 (Ala. 1989); Barron v. Construction One, 514 So.2d 1351,1353 (Ala. 1987); Elder v. E.I. DuPont De Nemours Co., 479 So.2d at 1248; Pate v. United States Steel Corp., 393 So.2d at 994; and Hughes v. Hughes, 367 So.2d 1384, 1386 (Ala. 1979). Where the defendant owns the premises, possession is undisputed and the issue is solely whether he reserved the right to control the manner in which the work was performed. Elder, 479 So.2d at 1248; Pate, 393 So.2d at 994; Hughes, 367 So.2d at 1386. Where we have found either possession or control missing, this Court has refused to find the defendant liable. Staples, 551 So.2d at 953; Barron, 514 So.2d at 1353; Elder, 479 So.2d at 1248; Pate, 393 So.2d at 994.
Stovall argues that she presented substantial evidence of Turner's control. She first alleges that Turner had a duty to provide adequate lighting. Yet as we discussed in Part I.A. of this opinion, there is no evidence that Turner reserved control over the manner in which the painters used the lighting.
Next Stovall argues that Turner "undertook responsibility for overall safety planning at the construction site." This is true. However, as we have held, a "general administrative responsibility for company-wide safety" is insufficient to find liability for failure to provide a safe workplace. Kennemer v.McFann, 470 So.2d 1113, 1117 (Ala. 1985). Additionally, inStaples, Proctor Gamble provided safety literature to its subcontractor, sent a member of its safety division to help the subcontractor set up a safety program, and even helped implement a "safety tracking system," yet we found that there was insufficient evidence of control on the part of Proctor Gamble.Staples, 551 So.2d at 954.
Third, Stovall alleges that Turner worked with Penwal to set up the safety mechanisms for the painters. Stovall quotes Turner's project manager as saying, "we planned very specifically to get to the top of the ladder, they clamp their ladder — their lanyard to these cables, these lifelines, and then they access where they need to go." (Emphasis added.) However, reading the next sentence, which Stovall omits, provides the critical context to understanding just who "we" refers to. The project manager continued: "So, yes, that was very specifically proposed byPenwal and, we don't dictate what Penwal does, but we are awareof what they're doing, and we didn't see anything wrong with thatprocedure." (Emphasis added.) The only reasonable reading of this sentence is that Penwal devised a system to which Turner simply had no strong objection. This situation seems particularly void of any reservation of control on Turner's part.
Because none of Stovall's allegations constitute substantial evidence indicating that Turner exercised any control over the painters' employment, this case is particularly similar toStaples, in which we found "no evidence that [Proctor Gamble] controlled the manner in which the work was done at the Buckeye plant." 551 So.2d at 954. In accordance with Staples, we find that Turner owed Elee no duty to provide a safe workplace.
 C. Intrinsically Dangerous Work
Stovall's third allegation is that the trial court erred because, she argues, genuine issues of material fact existed as *Page 1099 
to whether the work of painting the interior of the rocket was "intrinsically dangerous." This allegation lacks merit as well.
As stated above, a general contractor is liable for injuries to a third person where the work is "`of such kind or class that the doing of it, however carefully or skillfully performed, will probably result in damage, or is necessarily and intrinsically dangerous.'" Knight, 331 So.2d at 655 (quoting Baker v.Atlanta B. A. Ry., 163 Ala. at 105, 49 So. at 752).
We explained the concept of "intrinsically dangerous" work inBoroughs v. Joiner, 337 So.2d 340 (Ala. 1976). The risk posed by such an activity "`inheres in the performance of the contract and results directly from the work to be done, not from the collateral negligence of the contractor.'" Boroughs, 337 So.2d at 342 (quoting 41 Am.Jur.2d Independent Contractors § 41) (emphasis added). Such work involves a "`special danger'" that is "`inherent in or normal to the work.'" Boroughs, 337 So.2d at 342 (quoting Restatement (Second) of Torts § 427 (1965)). Intrinsically dangerous work is work fraught with danger, "no matter how skillfully or carefully it is performed." 41 Am.Jur.2dIndependent Contractors § 54.
This Court has previously found certain actions to be "intrinsically dangerous" — the application of a highly caustic paint remover, Jones v. Power Cleaning Contractors,551 So.2d 996, 999 (Ala. 1989); the aerial spraying of a pesticide,Boroughs, 337 So.2d at 343; and the use of dynamite, BankersFire Marine Ins. Co. v. Bukacek, 271 Ala. 182, 190,123 So.2d 157, 164 (1960).
We cannot say that any work done by Elee on the night of his death constituted "intrinsically dangerous" work. First, common sense dictates that painting from a ladder is simply not dangerous work, so long as the most rudimentary care is taken. Thus, this is not the sort of work where there is some risk of injury even when the worker exercises the utmost care and attention.
Further, we have held that similar work was not "intrinsically dangerous." In Barron v. Construction One, supra, a sheet-metal worker fell from an eight-foot ladder. We found no evidence, even under the old "scintilla of evidence" standard, that working from a ladder was intrinsically dangerous. Barron, 514 So.2d at 1353. Likewise, in Drennen Co. v. Jordan, 181 Ala. 570, 573,61 So. 938, 939 (1913), we held that "to paint the inside walls of a building, where they may be reached from an ordinary stepladder, is not to engage in the performance of a work necessarily and intrinsically dangerous to any one."[4]
Stovall did not present substantial evidence indicating that working from a ladder, painting, or even performing such work at night, is "intrinsically dangerous." Turner owed Elee no duty by virtue of the type of activity he was performing at the time of the accident.
 D. Negligent Inspection
Stovall's final argument is that Turner is liable for its alleged negligent inspection of the premises. She alleges that Turner undertook a duty to inspect *Page 1100 
the entire project site and that it performed this duty defectively, yielding the unsafe environment that caused Elee's death.
Before beginning the project, Stovall alleges, Turner "worked with the subcontractor, Penwal, in developing safety measures." Turner also "monitored the premises to ensure that safety measures were followed." The brief alleges that Turner had a safety plan for how ladders should be climbed. Turner reserved the right to enforce safety. Moreover, Turner's project manager monitored the premises for compliance with plans and specifications. He kept an eye out for blatant safety violations and was willing and able to halt the job if he saw such violations. After the fall occurred, he inspected the ladder from which Elee fell.
These facts, even resolving all reasonable doubts against Turner, do not constitute substantial evidence indicating that Turner undertook to inspect the premises. First, concerning Turner's work with Penwal, the record clarifies that Turner ensured that Penwal held safety meetings, known colloquially as "tool box meetings." This is apparently what Stovall refers to in alleging that Turner "worked with" Penwal in developing safety measures. Requiring subcontractors to actually have safety meetings, the content of which one does not control, is not akin to undertaking to inspect the premises or the subcontractor's work for safety measures. Stovall has failed to present substantial evidence indicating that Turner controlled how Penwal set safety goals.
As for the allegation in Stovall's brief to this Court that Turner created a safety plan, the project manager clarified that this plan was created not by Turner, but by Penwal. As was mentioned earlier, Kyle Reaves, the project manager, made clear that Penwal devised the safety plan, not Turner. Turner's action appears to extend no further than "signing off" on Penwal's safety plan.
Stovall also alleges that Turner reserved the right to inspect and that Turner's project manager could halt the job if he saw a "safety problem." However, the contractual reservation of a right to inspect does not equal the actual undertaking of a duty to perform a safety inspection. Hurst v. Wallace Constr. Co.,603 So.2d 985, 987 (Ala. 1992); Alabama Power Co. v. Williams,570 So.2d 589, 591 (Ala. 1990); Columbia Eng'g Int'l, Ltd. v.Espey, 429 So.2d 955, 966 (Ala. 1983). Further, the project manager stated that he would not halt the work "[u]nless it's something of imminent danger that is about to happen." We have confronted such an approach in past cases and have held that no duty to inspect was undertaken in those instances. For example, in Hurst, the field superintendent testified as follows:
 "`Q. You were just primarily interested in looking after the employees of Wallace Construction Company?
"`A. Yes, sir.
"`Q. You were not concerned about —
"`A. Yes, sir.
"`Q. — employees of the [subcontractors]?
 "`A. Yes, sir, I was concerned about them. If I had come by a scaffold that jumped out at me that wasn't safe, I would have said something rather than have somebody hurt.'"
Hurst, 603 So.2d at 987.
What we see in both approaches is the common-sense attitude that while the personnel of each contractor are required to look out only for the personnel of their contractor, emergency situations and imminent danger may warrant interference *Page 1101 
without a finding that one has undertaken to competently inspect the premises.
The project manager's movement about the premises looking for compliance with plans and specifications is also a sanctioned practice. We have repeatedly found that such actions do not admit of an undertaking to inspect the premises. Hurst, 603 So.2d at 987; Williams, 570 So.2d at 591; Espey, 429 So.2d at 967-68.
Finally, Stovall argues that the project manager inspected the ladder after the accident occurred; thus, he inspected the premises. But it would be irrational to hold a project manager's actions after an accident as determinative of whether the site was inspected before that accident. It is likely that any responsible organization would inspect the premises after an accident has occurred, no matter how insulated the organization was before the incident. Punishing an organization that is diligent in investigating accidents, in order to prevent them in the future, serves as a disincentive to investigate at all.
After evaluating all of the evidence marshaled by Stovall to prove that Turner endeavored to inspect the premises, we find no substantial evidence indicating that Turner undertook such a task. It appears clear from the record that Turner never endeavored to inspect the premises; thus, it owed no higher duty than that owed by a premises owner.
Because Stovall has failed in any of her four arguments to provide us with substantial evidence sufficient to reverse the summary judgment, the summary judgment in favor of Turner is due to be affirmed.
 II. Turner v. Penwal (case no. 1021953)[5]
Turner appeals the trial court's order granting Penwal's motion to dismiss Turner's third-party action. We reverse and remand.
 Standard of Review
Penwal's motion to dismiss was granted under Rule 12(b)(6), Ala. R. Civ. P., on the basis that Turner had failed to state a claim upon which relief may be granted. The trial court's December 17, 2002, order made clear that it was dismissing the case, not treating the motion as one for summary judgment. Therefore, the standard of review is not that applied in reviewing a summary judgment. Hales v. First Nat'l Bank ofMobile, 380 So.2d 797, 799 (Ala. 1980). Rather, we apply the standard of review for a ruling on a motion to dismiss, which is as follows:
 "This Court must review de novo the propriety of a dismissal for failure to state a claim and must resolve all doubts in favor of the plaintiff:
 "`It is a well-established principle of law in this state that a complaint, like all other pleadings, should be liberally construed, Rule 8(f), Ala. R. Civ. P., and that a dismissal for failure to state a claim is properly granted only when it appears beyond a doubt that the plaintiff can prove no set of facts entitling him to relief. Winn-Dixie Montgomery, Inc. v. Henderson, 371 So.2d 899 (Ala. 1979). . . .
 "`Where a 12(b)(6) motion has been granted and this Court is called upon to review the dismissal of the complaint, we must examine the allegations contained therein and construe *Page 1102 
them so as to resolve all doubts concerning the sufficiency of the complaint in favor of the plaintiff. First National Bank v. Gilbert Imported Hardwoods, Inc., 398 So.2d 258 (Ala. 1981). In so doing, this Court does not consider whether the plaintiff will ultimately prevail, only whether he may possibly prevail. Karagan v. City of Mobile, 420 So.2d 57 (Ala. 1982).'
 "Fontenot v. Bramlett, 470 So.2d 669, 671 (Ala. 1985)."
Bay Lines, Inc. v. Stoughton Trailers, Inc., 838 So.2d 1013,1017-18 (Ala. 2002).
 A. Choice of Law
Penwal, a California corporation, argues that California law, not Alabama law, applies to this case. While both parties wisely argue their respective cases under the laws of both Alabama and California, each clearly seeks to have us apply the law of a different state.
We thus revert to Alabama's choice-of-law principles. In a contractual dispute, Alabama law would have us first look to the contract to determine whether the parties have specified a particular sovereign's law to govern. Cherry, Bekaert Hollandv. Brown, 582 So.2d 502, 506 (Ala. 1991). Lacking such a contractual specification, we follow the principle of lex locicontractus, applying the law of the state where the contract was formed. Brown, 582 So.2d at 506. That state's law then governs unless it is contrary to the forum state's fundamental public policy. Id. at 506-07.
Nothing in the subcontract between Turner and Penwal specifies that the law of a particular state should govern any disputes under the subcontract. Likewise, there is no evidence in the record detailing where the contract was formed. At this stage, however, Turner's burden is merely to demonstrate that it can present a set of facts that would allow it to prevail under the law of either state.
B. The Effect of an Insurer's Insolvency
The trial court dismissed Turner's action because it found, based upon California law, that the insolvency of Penwal's insurer, Reliance, excused Penwal from fulfilling its contractual responsibility to indemnify and defend Turner. Turner argues that Reliance's insolvency is irrelevant, because Turner seeks to recover from Penwal. If the law of either Alabama or California permits Turner's recovery, we must reverse.
Penwal argued, and the trial court agreed, that seeking indemnity from an insured whose insurer has become insolvent unfairly gets around the protective intent of each state's insurance guaranty association law. We first analyze whether such a finding is consistent with Alabama law.
In support of its position, Turner cites Aetna Life CasualtyCo. v. Atlantic Gulf Stevedores, 590 So.2d 205 (Ala. 1991). InAetna, we allowed a claim for indemnity to proceed where the indemnitor's insurer had become insolvent, so long as the indemnitee could demonstrate it had incurred some out-of-pocket expenses. Aetna, 590 So.2d at 208. This holding was despite the fact that the indemnitee was insured by a solvent insurer and even though it covered essentially every cost. Aetna, 590 So.2d at 207-08.
It is possible that Turner could present a set of facts showing that it has incurred some out-of-pocket costs. Under Alabama law, Turner is due to be indemnified for any legal costs it has incurred. Therefore, because Turner has shown a set of facts that would allow recovery under Alabama law, we need not discuss whether it can also prevail under California law. Because *Page 1103 
Turner could possibly show a set of circumstances entitling it to relief, we must reverse the trial court's judgment of dismissal and remand this cause to the trial court for further adjudication.
1021938 — APPLICATION OVERRULED; OPINION OF APRIL 9, 2004, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED.
SEE, BROWN, and STUART, JJ., and MADDOX, Special Justice,* concur.
LYONS, JOHNSTONE, HARWOOD, and WOODALL, JJ., dissent.
1021953 — APPLICATION OVERRULED; OPINION OF APRIL 9, 2004, WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED.
SEE, BROWN, and STUART, JJ., and MADDOX, Special Justice,* concur.
JOHNSTONE, J., concurs in part.
LYONS, HARWOOD, and WOODALL, JJ., concur in the result.
[1] Stovall also relies upon Ex parte Kraatz, 775 So.2d 801,802 (Ala. 2000). At first blush, Kraatz appears to be an inadequate-lighting case also, but upon closer examination,Kraatz is a duty-to-warn case. Because Stovall does not argue on appeal that Turner owed Elee any duty to warn, we need not address Turner's duty to warn or the open-and-obvious nature of darkness.
[2] Section 25-1-1(c) defines "employer" as every person or entity "having control or custody of any employment, place of employment or of any employee. . . ."
[3] See Pate v. United States Steel Corp., 393 So.2d 992, 994
(Ala. 1981) ("A prime contractor has the duty of providing the employees of its subcontractors a safe place to work."); Hughesv. Hughes, 367 So.2d 1384, 1386-87 (Ala. 1979) (making a distinction between an owner-independent contractor relationship and a prime contractor-subcontractor relationship).
[4] Additionally, we observe that even performing such work at night cannot be classified as "intrinsically dangerous." Were it so, courts, lawyers, and law students alike would confront with amusement the list of "intrinsically dangerous" activities propounded by this Court: blasting, applying caustic chemicals, spraying toxic pesticides . . . and climbing ladders past sundown. The reality is that a reasonable person would exercise the care needed to ascend a ladder safely by, in this case, checking to ensure that the ladder was properly secured, whether it be night or day.
[5] Because we find that Turner is entitled to a summary judgment and therefore is not liable to Stovall, Turner no longer needs indemnity from Penwal for any damages that could have resulted from Stovall's action. However, Turner's case is not moot, because Turner has incurred expenses in the defense of this case, expenses it anticipated that Penwal would incur on its behalf.
* Retired Associate Justice HUGH MADDOX was appointed on February 23, 2004, to be a Special Justice in regard to these consolidated appeals.