964 So.2d 651 (2007)
Steven Allan FIKE et al.
v.
John Earl PEACE et al.
1051391.
Supreme Court of Alabama.
January 12, 2007.
Rehearing Denied March 16, 2007.
*652 Robert B. French, Jr., and Tommy Allen French of Robert B. French, Jr., P.C., Fort Payne, for plaintiffs Steve Allen Fike et al.
S. Joshua Briskman of Baxley, Dillard, Dauphin, McKnight & Barclift, Birmingham, for plaintiff Jerry Westbrook, as executor of the estate of Billie Nadine Bigham.
David S. Elliott and Geoffrey S. Bald of Burr & Forman, LLP, Birmingham, for defendant General Shale Products, LLC.
Doy Leale McCall III of Hill, Hill, Carter, Franco, Cole & Black, P.C., Montgomery, for amicus curiae Alabama Defense Lawyers Association, in support of the defendants.
STUART, Justice.
The United States District Court for the Northern District of Alabama, Middle Division, certified to this Court the following questions pursuant to Rule 18, Ala. R.App. P.:
"1. Under Alabama law, does the mere contracting for the hauling of an oversize load make the shipper vicariously liable for the negligence of the independent contractor trucking company?
"2. If there is some general liability for negligence of an independent contractor merely because of the oversize load, does the liability of the shipper extend to causes unrelated to the oversize load per se, such as improper brakes or driving?"
We answer the first question in the negative. Because of our resolution of the first question, we need not address the second question.

Facts
This Court has no record from which to determine its own statement of the facts presented by the certified questions; we rely on the following statement of the facts as provided by the federal district court:
"On July 14, 2003, Steven Allan Fike (`Fike'), Billie Nadine Bigham (`Bigham'), Andrea Raiford Doxtator (`Doxtator'), April Gowen (`Gowen')  Doxtator's minor daughter  and two other minor children of Doxtator, not party to this suit, were driving in a 1997 Ford pickup truck on Alabama State Highway 35 in Cherokee County, Alabama. As traffic began backing up because of a slow vehicle, Fike, the driver of the truck, *653 pulled into the left hand lane to pass. A tractor-trailer being driven by John Earl Peace (`Peace') pulled into the left lane at about the same time, behind the truck being driven by Fike. The brakes on the tractor-trailer failed to function properly, and the tractor-trailer began to pick up speed. Noticing that the tractor-trailer appeared to be out of control, Fike pulled his truck as far left off of the road as he could. Peace, not wanting to run his tractor-trailer off the road, attempted to squeeze through the gap made by Fike on the far left and the lane of slowed traffic on the right. The tractor-trailer's load was oversized, and Peace was unable to navigate the gap. The load struck Fike's truck on the right side, instantly killing Bigham, and injuring Gowen, Doxtator, and Fike, as well as destroying the pickup truck.
"Defendant General Shale Products, LLC (`General Shale') is in the business of manufacturing brick. In the summer of 2003, General Shale hired Defendant DG Trucking [and Equipment Sales, Inc.,] to haul equipment from the General Shale plant in Kentucky to its new plant in Georgia. The cargo in question was large steel kiln cars used in the manufacture of brick. Due to the size of the kiln cars, they are considered to be an oversized load. General Shale, though a licensed motor carrier, generally does not haul oversized loads; DG Trucking is a licensed motor carrier that specializes in hauling such loads. General Shale has had a fifteen-year relationship with DG Trucking, using them to haul oversize loads when necessary. There is no evidence that General Shale has ever had any problems with DG Trucking and its methods, safety history, or observation of legal requirements for a commercial motor carrier. At the time of the Fike accident, Peace was driving a DG Trucking tractor-trailer loaded with General Shale's kiln cars. After the accident, an inspection of the tractor-trailer by the Alabama State Troopers revealed several violations of the federal safety regulations applicable to motor carriers, including brakes that were out of adjustment.
"On August 28, 2003, Fike, Bigham, Doxtator, and Doxtator as next friend of Gowen, filed suit against Peace, DG Trucking, and General Shale in the Circuit Court of DeKalb County, Alabama. In Count I of the complaint, titled `Negligence or Willful and Wanton Misconduct,' the plaintiffs allege that Peace negligently, or willfully and wantonly, operated a tractor-trailer that was overloaded, without the required escort of a pilot vehicle, and attempted to navigate down the middle of the road, instead of risking injury to himself by pulling his own truck off the road. The plaintiffs further allege that DG Trucking negligently, or willfully and wantonly, entrusted the tractor-trailer into the hands of Peace in a defective and substandard condition  not having been properly inspected and maintained. The plaintiffs also allege that both DG Trucking and General Shale were negligent or willful and wanton when they contracted with each other to haul the oversized load, that DG Trucking was negligent or willful and wanton in allowing Peace to drive an overloaded tractor-trailer, and that General Shale breached its duty to operate in a safe manner when it `accepted without objection' goods that had been unsafely transported by DG Trucking.
"In Count II of the Complaint, titled `Wrongful Death,' the plaintiffs allege that the defendants' behavior resulted in the death of Billie Nadine Bigham. Fike, as administrator of the estate of Bigham, his mother, claims to bring the *654 action pursuant to Alabama Code § 6-5-410 (1975). The plaintiffs demand money damages in an amount to be determined by a jury. On October 9, 2003, the defendants removed this action to the Northern District of Alabama, Middle Division, based on diversity jurisdiction as outlined in 28 U.S.C. § 1332."[1]

Relevant Caselaw
Although this Court has not had an occasion to address the precise question presented by the first certified question, we have, in previous cases, concluded that an entity or person may be liable for the negligence of an independent contractor under limited circumstances. In Boroughs v. Joiner, 337 So.2d 340 (Ala.1976), this Court stated:
"The general rule in this state, and in most others, is that:
"` . . . one is not ordinarily responsible for the negligent acts of his independent contractor. But this rule, as most others, has important exceptions. One is that a person is responsible for the manner of the performance of his nondelegable duties, though done by an independent contractor, and therefore, that one who by his contract or by law is due certain obligations to another cannot divest himself of liability for a negligent performance by reason of the employment of such contractor. [Citations Omitted].'
". . . .
"It is also generally recognized that one who employs a contractor to carry on an inherently or intrinsically dangerous activity cannot thereby insulate himself from liability."
337 So.2d at 342.
This general rule was applied by this Court in General Finance Corp. v. Smith, 505 So.2d 1045 (Ala.1987), which held a secured party vicariously liable for a breach of the peace by its independent contractor, which resulted when the independent contractor attempted to repossess the collateral used to secure the debt. This Court recognized that § 7-9-503, Ala. Code 1975 (now repealed), allowed a secured party to avoid judicial process by repossessing its collateral, but only if that repossession could be done without a breach of the peace.[2] The Court concluded that, even if the secured party relied on an independent contractor to repossess the collateral, the secured party could not disclaim liability for any breach of the peace resulting from that attempted repossession. The Court in General Finance Corporation stated:
"The legislature, in enacting § 7-9-503, supra, did not attempt to set out with specificity the safeguards or precautions which a secured party must *655 take in order to effect a peaceful repossession. By implication, however, a secured party is under a duty to take those precautions which are necessary at the time to avoid a breach of the peace. It is axiomatic that this duty is based on sound public policy.
"Assuming, without deciding, that the status of H & B Recoveries as an independent contractor was undisputed by the evidence, the defendant could not delegate to H & B Recoveries its liability for the wrongful manner in which the repossession was accomplished."
505 So.2d at 1048. In reaching its conclusion, the Court in General Finance Corporation relied on, among other things, the Restatement (Second) of Torts § 424 (1965), which provides:
"`One who by statute or by administrative regulation is under a duty to provide specified safeguards or precautions for the safety of others is subject to liability to the others for whose protection the duty is imposed for harm caused by the failure of a contractor employed by him to provide such safeguards.'"
505 So.2d at 1048.
In Jones v. Power Cleaning Contractors, 551 So.2d 996 (Ala.1989), this Court recognized that the use of a highly caustic paint remover was an inherently dangerous activity and that the general contractor could not disclaim liability for its subcontractor's negligence in the use of the remover. In Jones, the University of North Alabama ("UNA") contracted with Sequoia Construction Company, a general contractor, to refinish one of its buildings. In order to perform the job it had contracted to do, Sequoia had to remove the old paint from the building. Sequoia subcontracted the entire project to another contractor, who, in turn, subcontracted the entire job to Quality Waterproofing, another contractor.
As Quality proceeded to remove the paint, one of Quality's employees was injured when "PC X-25"  the highly caustic paint remover Quality selected to use for the project  splashed in his eye. The worker was blinded in that eye as a result. The injured worker sued Sequoia, Quality, and the supplier of the paint remover.
In analyzing whether the worker had a viable claim against Sequoia, this Court reviewed the law of negligence, stating that "[a]s a general rule, a contractor must accept responsibility for the negligent acts of his independent contractor if the independent contractor is engaging in inherently or intrinsically dangerous acts." 551 So.2d at 998. The Jones Court noted that all parties had admitted that the chemical selected for use by Quality was extremely dangerous; as a result, the Court concluded that "[t]here is no doubt that the application of PC X-25 would fall within the ambit of" an intrinsically dangerous act. 551 So.2d at 999. The Court also observed that the contract between UNA and Sequoia specified that Sequoia would be responsible for the "acts and omissions of subcontractors" and that Sequoia would "take all necessary precautions" to provide a safe workplace for the workers. 551 So.2d at 999. For these reasons, the Court in Jones concluded that Sequoia, the general contractor, was liable for the negligence of Quality, the subcontractor.
In Boroughs v. Joiner, supra, this Court recognized that the use of pesticides and insecticides was an inherently dangerous activity. In reaching this conclusion, the Court noted:
"The Legislature of Alabama has recognized that insecticides and pesticides are intrinsically dangerous and has adopted statutes regulating the sale, distribution and application of those products in this state. The legislature stated its purpose in enacting the Alabama *656 Pesticide Act of 1971 (Title 2, § 337(9a), et seq.). § 337(12a) is as follows:
"`The purpose of this article is to regulate, in the public interest, the application of pesticides. . . . [S]uch materials when misused may seriously injure health, property, crops, wildlife, bees, and fish. Pesticides may also injure man and animals, either by direct poisoning or by gradual accumulation of poisons in the tissues. . . . A pesticide applied by aircraft or ground equipment for the purpose of controlling diseases, insects or weeds in a crop which is not itself injured by the pesticide may drift, sometimes for miles, and injure or contaminate other crops and other things with which it comes in contact. Therefore, it is deemed necessary and in the public interest to provide some means of regulating the application of pesticides.'
"Under the statutory scheme adopted by the legislature, such products must be registered with the Department of Agriculture and Industries. Each must bear a label describing the degree of toxicity, and each must bear warnings of the dangers inherent in the use thereof. One must have a permit to purchase such products. Aviators must be licensed to engage in crop dusting or spraying and must pass an examination satisfactory to the Commissioner of Agriculture demonstrating knowledge of the dangers involved in the application thereof.
"We hold that aerial application of insecticides and pesticides falls into the intrinsically or inherently dangerous category and, therefore, the landowner cannot insulate himself from liability simply because he has caused the application of the product to be made on his land by an independent contractor.
". . . .
"The test of liability on the part of the landowner is one of reasonableness. Liability is not absolute but is imposed on the landowner for his failure to exercise due care in a situation in which the work being performed is sufficiently dangerous that the landowner himself has a duty to third persons who may sustain injury or damage from the work unless proper precautions are taken in the performance thereof."
337 So.2d at 343. For these reasons, the Court held that a landowner who contracted for the spraying of pesticides or insecticides was subject to liability if the contractor failed to use proper precautions in connection with the spraying.[3]
Conversely, this Court has applied these general rules in other contexts to find the employer not vicariously liable for the negligence of an independent contractor. For example, in Stovall v. Universal Construction Co., 893 So.2d 1090 (Ala.2004), this Court recognized that the painting of the interior of a "rocket replica" at night was not an inherently dangerous activity when the issue before the Court was whether the general contractor should be held liable for the injuries sustained by an employee of the subcontractor who died after falling off a ladder. The Court stated:
"[A] general contractor is liable for injuries to a third person where the work *657 is `"of such kind or class that the doing of it, however carefully or skillfully performed, will probably result in damage, or is necessarily and intrinsically dangerous."' . . .
"We explained the concept of `intrinsically dangerous' work in Boroughs v. Joiner, 337 So.2d 340 (Ala.1976). The risk posed by such an activity `"inheres in the performance of the contract and results directly from the work to be done, not from the collateral negligence of the contractor."' Boroughs, 337 So.2d at 342 (quoting 41 Am.Jur.2d Independent Contractors § 41) (emphasis added). Such work involves a `"special danger"' that is `"inherent in or normal to the work."' Boroughs, 337 So.2d at 342 (quoting Restatement (Second) of Torts § 427 (1965)). Intrinsically dangerous is work fraught with danger, `no matter how skillfully or carefully it is performed.' 41 Am.Jur.2d Independent Contractors § 54.
". . . .
"We cannot say that any work done by [the employee] on the night of his death constituted `intrinsically dangerous' work. First, common sense dictates that painting from a ladder is simply not dangerous work, so long as the most rudimentary care is taken. Thus, this is not the sort of work where there is some risk of injury even when the worker exercises the utmost care and attention."
893 So.2d at 1099.
In Pope v. City of Talladega, 602 So.2d 890 (Ala.1992), the City of Talladega hired an independent contractor to perform construction work; this construction work required the contractor to excavate certain sites. Under his contract with the City, the independent contractor was liable for all "conditions of the job site, including safety of all persons and property. . . ." The independent contractor hired another contractor to assist him. This subcontractor was killed when the wall of an excavation sight caved in.
The decedent's widow sued, among others, the City of Talladega, claiming that the excavation work was inherently dangerous and that the City was therefore vicariously liable. However, the Court rejected that argument, holding that the cave-in would not have happened if the contractors had shored or sloped the walls as required by OSHA regulations. Because the danger could have been avoided by the use of reasonable care, the Court refused to find the excavation work at issue in Pope to be inherently dangerous. Pope, 602 So.2d at 893.
In Williams v. Tennessee River Pulp & Paper Co., 442 So.2d 20 (Ala.1983), this Court concluded that a logging company that had hired an independent contractor to haul logs could not be held liable for damage proximately caused by the contractor's failure to properly maintain his truck. The Court noted that an accident involving the log truck and a vehicle was caused when a hub and a wheel of the truck fell off as a result of improper maintenance and repairs. The Court specifically noted that the accident was not caused by the manner in which the logs had been loaded onto the trailer portion of the truck.
After considering other theories of liability, the Court addressed the plaintiff's claim that the hauling of logs presented a "peculiar risk of physical harm" and, therefore, that the general contractor could be held liable for damages caused by the subcontractor's negligence in performing that act. In support of this argument, the plaintiff relied upon the Restatement *658 (Second) of Torts § 416 (1965).[4]
The Court in Williams v. Tennessee River Pulp & Paper Company rejected this theory, stating:
"No Alabama case has formally adopted § 416 and we do not need to reach the issue in this case.[5] Rather, we hold, as a matter of law, that the faulty maintenance of wheels and the hauling of pulp timber do not constitute a peculiar risk of physical harm which requires special precautions. Comment d. of § 416 illustrates our view:
"`[I]f a contractor is employed to transport the employer's goods by truck over the public highway, the employer is not liable for the contractor's failure to inspect the brakes on his truck, or for his driving in excess of the speed limit, because the risk is in no way a peculiar one, and only an ordinary precaution is called for.'
"Tennessee Paper [the logging company] may be responsible for special precautions to anchor a load of giant trees which constitute a peculiar risk, but it is not responsible for the independent contractor's compliance with simple maintenance procedures and load factors. . . . Hence, appellants cannot impose liability under § 416 upon Tennessee Paper under the facts in this case.
"We hold that the trial court correctly granted summary judgment [to Tennessee Paper] on the grounds of Mauldin's independent contractor status and liability under Restatement (Second) of Torts § 416 (1965)."
442 So.2d at 23 (footnote omitted).

Analysis of the Instant Case
We must determine whether General Shale Products, LLC, is subject to liability for the damage caused to the third parties as a result of DG Trucking's negligence to properly maintain its truck.[6] Applying the principles stated above to the facts presented in these certified questions, in order to find General Shale subject to liability for DG Trucking's negligence, we must find (1) that General Shale owed a nondelegable duty to those third parties injured as a result of DG Trucking's negligence; or (2) that General Shale caused DG Trucking to engage in an inherently dangerous activity.
We first consider the nondelegable-duty theory. We note that the legislature has enacted statutory limits applicable to the hauling of an oversized load by motor carrier. Chapter 9 of Title 32 of the Alabama *659 Code 1975 addresses "Trucks, Trailers and Semi-Trailers." Specifically, § 32-9-20, Ala.Code 1975, provides, in pertinent part:
"It shall be unlawful for any person to drive or move on any highway in this state any vehicle or vehicles of a size or weight except in accordance with the following:
"(1) Width. Vehicles and combinations of vehicles, operating on highways with traffic lanes 12 feet or more in width, shall not exceed a total outside width, including any load thereon, of 102 inches, exclusive of mirrors or other safety devices approved by the State Transportation Department. The Director of the State Transportation Department may, in his or her discretion, designate other public highways for use by vehicles and loads with total outside widths not exceeding 102 inches, otherwise; vehicles and combinations of vehicles, operating on highways with traffic lanes less than 12 feet in width, shall not exceed a total outside width, including any load thereon, of 96 inches, exclusive of mirrors or other safety devices approved by the State Transportation Department. No passenger vehicle shall carry any load extending beyond the line of the fenders. No vehicle hauling forest products or culvert pipe on any highway in this state shall have a load exceeding 102 inches in width."
Section 32-9-29, Alabama Code 1975, is also applicable to this case; that section reads as follows:
"(1) The Director of the Department of Transportation or the official of the department designated by the director may, in his discretion, upon application and for good cause being shown therefor, issue a permit in writing authorizing the applicant to operate or move upon the state's public roads a vehicle or combination of no more than two vehicles, and loads whose weight, width, length or height, or combination thereof, exceeds the maximum limit specified by law; provided, that the load transported by such vehicle or vehicles is of such nature that it is a unit which cannot be readily dismantled or separated; provided however, that bulldozers and similar construction equipment shall not be deemed readily separable for purposes of this chapter; and further provided, that no permit shall be issued to any vehicle whose operation upon the public roads of this state threatens to unduly damage a road or any appurtenances thereto."
Finally, the penalties imposed for violation of Chapter 9 are set forth in § 32-9-5, Ala.Code 1975. That section provides:
"The operation of any truck, semitrailer truck or trailer in violation of any section of this chapter or of the terms of any permit issued under this chapter, shall constitute a misdemeanor, and the owner thereof, if such violation was with his knowledge or consent, and the operator thereof shall, on conviction, be fined not less than $100.00 nor more than $500.00 and may also be imprisoned or sentenced to hard labor for the county for not less than 30 days nor more than 60 days."
(Emphasis added.)
In Heathcock v. State, 415 So.2d 1198 (Ala.Crim.App.1982), the Court of Criminal Appeals discussed the purposes underlying these statutes:
"We have no doubt that one intention of the Legislature in enacting the law as now found in Code of Alabama 1975, § 32-9-20, a lengthy section governing the size and weight of trucks, trailers, and semi-trailers traveling on highways of Alabama, was, as appellant says, `to *660 prevent injury to the roads,' but we do not agree with appellant that this was the only intention of the Legislature:
"`The obvious purposes for enacting truck weight laws is for the safety of the public, and keeping highways in good condition for the traveling public. Travel upon the highways must be as safe as it can reasonably be made consistent with their efficient use. Any overloaded truck creates a safety hazard upon the public highway as well as contributing to a bad state of repair.'"
415 So.2d at 1203, quoting State Dep't of Public Safety v. Scotch Lumber Co., 293 Ala. 330, 302 So.2d 844, 846 (1974). See also Leonard v. State, 38 Ala.App. 138, 142, 79 So.2d 803, 807 (1955) ("`The purpose of statutes prohibiting the use of public highways by motor vehicles of excessive weight is to prevent injury to the public property in the form of damage to roads, bridges, etc., and further to insure the safety of persons traveling such highways.'")
Thus, as did the legislature in Boroughs v. Joiner and General Finance Corp. v. Smith, supra, the legislature found it appropriate to regulate the activity at issue in this case: the transport of oversized loads by motor carrier. However, the express language of the statutes does not impose any duty upon the shipper of that oversized load. The relevant statutes impose a duty of compliance upon the operator of the truck, semitrailer truck, or trailer, and possibly upon the owner of such truck or trailer. See § 32-9-5, § 32-9-20, and § 32-9-29, Ala.Code 1975. Thus, we conclude that General Shale was not subject to a nondelegable duty as a result of Chapter 9 of Title 32 of the Alabama Code 1975. Because we find no other duties imposed upon General Shale by statute, caselaw, or common law that are relevant to the issues before us, we must conclude that General Shale is not subject to liability for the negligence of its independent contractor on the basis of a nondelegable duty.[7]
We next consider whether this case involves an inherently dangerous activity, thereby imposing liability upon General Shale for the negligence of DG Trucking in the performance of that inherently dangerous activity. An "intrinsic danger" or "inherent danger" in an undertaking "`is one which inheres in the performance of the contract and results directly from the work to be done, not from the collateral negligence of the contractor, and important factors to be understood and considered are the contemplated conditions under which the work is to be done and the known circumstances attending it.'" Boroughs v. Joiner, 337 So.2d at 342 (quoting 41 Am. Jur.2d, Independent Contractors § 41).
When considering the other activities previously recognized in this State as inherently dangerous  the aerial spraying of pesticides and insecticides, the use of a highly caustic chemical, and the use of dynamite as an explosive  we must conclude that the shipping of an oversized load does not rise to the same level. We agree with the statement in the brief submitted by the amicus curiae in support of Peace: "There is nothing to suggest that if the proper precautions are in fact taken in regard to [the shipping of an oversized load], that this activity is hopelessly fraught with danger, no matter how skillfully *661 or carefully it is performed." (Brief of amicus curiae Alabama Defense Lawyers Association at p. 9.)
We find the analysis and reasoning of Inland Steel v. Pequignot, 608 N.E.2d 1378 (Ind.Ct.App.1993), particularly on point. In that case, Inland Steel contracted with a motor carrier to ship a 48,000-pound coil of steel from Illinois to Ohio. While hauling the steel coil, the motor carrier's driver ran a red light and collided with Pequignot, who was on a motorcycle. Pequignot was seriously injured. Pequignot sued Inland Steel, asserting, among other theories, that because of the size and weight involved, the hauling of the steel coil was an inherently dangerous activity for which Inland Steel was vicariously liable.
In analyzing the liability issue, the Indiana Court of Appeals stated:
"Although the parties use the terms `inherently dangerous or intrinsically dangerous' interchangeably, it is apparent to us they are alluding to what the First Restatement of Torts § 519 (1938) referred to as `ultra-hazardous' activity and which the Restatement (Second) §§ 519 & 520 (1977), calls `abnormally dangerous' activity to impose strict liability. . . . This doctrine, which evolved from Rylands v. Fletcher (1868), L.R. 2 H.L. 330, provides:
"`(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
"`(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.'
"Restatement (Second) § 519.
"Section 520 of the Second Restatement provides:
"`In determining whether an activity is abnormally dangerous, the following factors are to be considered:
"`(a) Existence of a high degree of risk of some harm to the person, land or chattels of another;
"`(b) Likelihood that the harm that results from it will be great;
"`(c) Inability to eliminate the risk by the exercise of reasonable care;
"`(d) Extent to which the activity is not a matter of common usage;
"`(e) Inappropriateness of the activity to the place where it is carried on;
"`(f) Extent to which its value to the community is outweighed by its dangerous attributes.'
"Restatement (Second) § 520. `The general principle derived from Rylands is that where a person chooses to use an abnormally dangerous instrumentality, that person is strictly liable without a showing of negligence for any injury proximately caused by that instrumentality.' 57A Am.Jur.2d Negligence § 396 (1989).
". . . .
"We find that § 520(c) as well as our reasoning in Erbrich Products [Co. v. Wills, 509 N.E.2d 850 (Ind.Ct.App. 1987),] is dispositive of this question. Hauling steel, or any other heavy load, is not `inherently dangerous,' `intrinsically dangerous,' `ultra-hazardous' or `abnormally dangerous' as these terms are used in strict liability. It is readily apparent that if the driver of the truck, Hinds, had used reasonable care, this tragic accident would not have happened. It is undisputed that Hinds ran a red light at 40 [miles per hour.] It is also clear to us that the coil of steel was not the proximate cause of Pequignot's injuries. While riding a motorcycle, he hit a tractor-trailer carrying 48,000 *662 pounds of steel and traveling at 40 mph. He hit the trailer  the coil of steel did not fall off the trailer and hit him. It would make no difference if the tractor-trailer was carrying 48,000 pounds of steel or sand or even wood chips. When a motorcycle strikes or is struck by a tractor-trailer running a red light, especially one traveling at 40 mph, the motorcyclist is going to come out the loser  if at all."
608 N.E.2d at 1384-85. For these reasons, the Indiana Court of Appeals held that Inland Steel was entitled to a summary judgment on Pequignot's claims of liability.
Like the accident in Inland Steel, supra, the accident in this case was not caused by the oversized load but by the "collateral negligence" of the owner and/or operator of the tractor-trailer. See Boroughs v. Joiner, 337 So.2d at 342 (quoting 41 Am. Jur.2d, Independent Contractors § 41); see Inland Steel, 608 N.E.2d at 1385 (referring to the independent contractor's failure to use reasonable care). It is undisputed that the brakes on Peace's truck failed and that an inspection of Peace's truck after the accident revealed numerous violations of the applicable Federal Department of Transportation regulations, including a failure to properly adjust the brakes. The fact that Peace was hauling an oversized load played no role in the accident, and there is no evidence to indicate that this accident would have occurred if Peace or DG Trucking had maintained the brakes on the tractor-trailer, as they had a duty to do. Thus, the hauling of this heavy load does not meet the definition of an "inherently dangerous" activity because the major risk of harm from the oversized load could have been alleviated if Peace and DG Trucking had used reasonable care.

Conclusion
Under the facts as presented to us by the district court, we conclude that General Shale did not owe a nondelegable duty to the third parties injured as a result of DG Trucking's negligence. We also observe that the hauling of the kiln cars did not constitute an inherently dangerous activity. Therefore, we find no basis upon which to impose vicarious liability upon General Shale for the alleged negligence of DG Trucking. For these reasons, we answer the first certified question in the negative. Because of our resolution of the first certified question, we need not address the second certified question; we therefore decline to answer the second question.
QUESTION NO. 1 ANSWERED; QUESTION NO. 2 DECLINED.
NABERS, C.J., and WOODALL, BOLIN, and PARKER, JJ., concur.
SEE, LYONS, HARWOOD, and SMITH, JJ., concur specially.
HARWOOD, Justice (concurring specially).
I concur specially. Rule 18(d), Ala. R.App. P. specifies that when a federal court certifies a question of law to this Court, the certification should contain "a statement of facts showing the nature of the cause and the circumstances out of which the questions or propositions of law arise and the question of law to be answered." The main opinion points out that this Court has no record from which it can determine the underlying facts and necessarily must rely on the statement of facts as provided by the federal district court. The main opinion sets those facts out completely, and it is to be noted that the facts contain no reference whatsoever to the width of the oversized load of steel kiln cars being carried on the tractor trailer. *663 The particulars of the load, so far as its size is concerned, do not form a part of the certified questions. Rather, the district court phrases its two questions entirely in the abstract, and asks in the first one only about the legal implications of "the mere contracting for the hauling of an oversize load." The main opinion properly responds to this generic, generalized question, expressly stating that the conclusion reached is premised "[u]nder the facts as presented to us." 964 So.2d at 662. I agree that under the facts as provided by the district court, "the hauling of the kiln cars did not constitute an inherently dangerous activity." 964 So.2d at 662.
However, the parties volunteer additional facts in their briefs, and they agree that the width of the kiln cars as loaded on the tractor trailer was 17 feet 8 inches, or 212 inches, and that the two-lane road on which the collision occurred was not more than 24 feet wide. Further, they agree that General Shale Products, LLC, loaded the kiln cars onto the tractor-trailer using its own crane, so that it was aware of the configuration of the load, including its width, when the tractor-trailer left its premises carrying the load. If the district court had included these facts in its certification, thus particularizing the situation, I would be inclined to answer the question thus shaped in a somewhat different fashion.
SEE, LYONS, and SMITH, JJ., concur.
NOTES
[1] In its brief filed with this Court, General Shale Products, LLC, indicates that the district court entered a summary judgment in favor of General Shale as to all claims asserted directly against it. (See General Shale's brief at p. 19.) Although the district court's recitation of the facts does not expressly include this statement, the court's statement of the facts does intimate that General Shale is subject to liability only if it may be held liable for DG Trucking's negligence, if any. We will not address the question of General Shale's liability based on alleged negligent selection of DG Trucking.
[2] Section 7-9-503, Ala.Code 1975, which has since been repealed, stated, in pertinent part: "Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action." The Court in General Finance Corporation defined "breach of the peace" to mean "without risk of injury to the secured party, the debtor, or innocent bystanders." See 505 So.2d at 1048.
[3] Additionally, this Court has held that the use of dynamite as an explosive is an inherently dangerous activity. See Bankers Fire & Marine Ins. Co. v. Bukacek, 271 Ala. 182, 123 So.2d 157 (1960). The opinion in Bankers Fire addressed insurance-coverage issues in the context of a constable who used dynamite to destroy an illegal still and thereby damaged the house in which the still was located. Because of the issues presented in Bankers Fire, the analysis and reasoning used by the Court in that opinion are not relevant here, and no further discussion of that case is necessary.
[4] The Restatement (Second) of Torts § 416 provides:

"One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."
[5] The Court in Williams v. Tennessee River Pulp & Paper Co., indicated in a footnote that "[e]ven though we have not embraced § 416, we have adopted its general principles in an earlier case." See 442 So.2d at 23 n. 2 (citing and quoting from Thomas v. Saulsbury & Co., 212 Ala. 245, 246-47, 102 So. 115, 116 (1924)).
[6] In the facts provided to this Court by the federal district court, the district court observed that "[t]he brakes on the [DG Trucking] tractor-trailer failed to function properly, and the tractor-trailer began to pick up speed. . . . After the accident, the inspection of the tractor-trailer by the Alabama State Troopers revealed several violations of the federal safety regulations applicable to motor carriers, including brakes that were out of adjustment." Certification of question of law, pp. at 2-3.
[7] We recognize that the duty to exercise due care was applicable to General Shale under the common law. However, the facts as stated by the district court indicate that General Shale complied with that duty. We also interpret the questions certified to us to require the presumption that General Shale has not acted in a negligent manner.